# 13 CIV 7804

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WEST PALM BEACH POLICE PENSION FUND AND TAUNTON CONTRIBUTORY RETIREMENT SYSTEM, Individually and On Behalf Of All Others Similarly Situated,<br><br>              Plaintiffs,<br><br>vs.<br><br>FRANCESCA'S HOLDING CORPORATION, JOHN DE MERITT, NEILL P. DAVIS, GENE MORPHIS, KYONG GILL, MARK VENDETTI, GREG BRENNEMAN, PATRICIA A. BENDER, RICH EMMETT, JOSEPH SCHARFENBERGER, RICHARD KUNES, MARIE TOULANTIS, RICH ZANNINO, THERESA BACKES, KAL MALIK, CYNTHIA THOMASSEE, SEI JIN ALT, RANDI SONENSHEIN, GOLDMAN, SACHS & CO., J.P. MORGAN SECURITIES LLC, STIFEL, NICOLAUS & COMPANY, INCORPORATED, KEYBANC CAPITAL MARKETS INC., RBC CAPITAL MARKETS, LLC, AND JEFFERIES & COMPANY, INC.<br><br>              Defendants. | CASE NO.<br><br><br>CLASS ACTION<br><br><br><br>**JURY TRIAL DEMANDED** |

RECEIVED
NOV - 4 2013
U.S.D.C. S.D. N.Y.
CASHIERS

## CLASS ACTION COMPLAINT
## FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiffs West Palm Beach Police Pension Fund and Taunton Contributory Retirement System ("Plaintiffs") allege upon personal knowledge as to allegations specifically pertaining to Plaintiffs and, as to all other matters, upon the investigation of counsel, which included, without limitation: (a) review and analysis of public filings made by Francesca's Holdings Corporation ("FRAN" or the "Company") and other related parties and non-parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) review of news articles, shareholder communications, conference calls and postings on FRAN's website concerning the Company's public statements; and (d) review of other publicly available information concerning FRAN, the Individual Defendants, the Officer and Director Defendants and the Underwriter Defendants (as defined below).

I.      **NATURE OF THE ACTION**

1.      This is a federal securities class action against FRAN and certain of its officers and/or directors, and the underwriters for violations of the federal securities laws.  Plaintiffs bring this action on behalf of all persons or entities that purchased or otherwise acquired FRAN securities between January 10, 2012 and September 3, 2013, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). The Exchange Act claims allege that certain defendants engaged in a fraudulent scheme to artificially inflate the Company's stock price.

2.      The action is also brought on behalf of all persons or entities who purchased shares of FRAN's common stock pursuant and/or traceable to one of the Company's Secondary Public Offerings (collectively, the "Offerings"), seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act").  The first Secondary Public Offering commenced on or about

January 26, 2012 for the sale of approximately 10,400,000 shares, with the underwriters having the option to purchase up to an additional 1,560,000 shares (the "Jan. 2012 SPO"). The second Secondary Public Offering commenced on or about April 17, 2012 for the sale of 9,000,000 shares of common stock, with the underwriters having the option to purchase up to an additional 1,350,000 shares (the "Apr. 2012 SPO"). The third Secondary Public offering began on or about March 27, 2013 for the sale of 7,394,727 shares of the Company's common stock (the "Mar. 2013 SPO").

3.     Under the Securities Act, defendants are strictly liable for the material misstatements in the Offering Documents (as defined below) for these public stock offerings, and these claims specifically exclude any allegations of knowledge or scienter. The Securities Act claims also expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

4.     This Complaint alleges that in FRAN's Offering Documents and throughout the Class Period, Defendants failed to disclose material adverse facts about the Company's financial well-being and future prospects. As a result of Defendants' wrongful acts, false and misleading statements and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and the other Class members have suffered significant losses and damages.

5.     FRAN, a Delaware corporation, headquartered in Texas purports to be a "growing" specialty retailer with 429 retail locations in 44 states in the United States designed and merchandised to feel like independently-owned, upscale boutiques selling a mix of women's apparel, jewelry and accessories.

6.     On July 21, 2011, FRAN completed its initial public offering ("IPO") of 11.5 million shares of common stock of which only 2.9 million shares (2,941,176 shares) were sold

by the Company while approximately 8.6 million shares were sold by the selling stockholders (including 616,109 by members of the Company's management).

7.      Subsequent to the IPO, the Company completed three follow-on offerings on or about January 26, 2012, April 17, 2012 and March 27, 2013, where certain stockholders (including members of the Company's management) sold approximately 12.0 million, 9.0 million and 7.4 million shares of the Company's common stock, respectively.  The most recent offering, the Mar. 2013 SPO, allowed certain selling stockholders (CCMP Capital Advisors[1]) to completely exit their position in the Company.

8.      FRAN touted its success, stressing that the Company's profit margins were due in part to FRAN's commitment to constantly bringing new merchandise to its stores inspiring repeat visits, thereby helping to increase store sales and outperform competitors.

9.      However, investors and analysts often questioned FRAN's profit margins and product purchasing practices.  In particular, on April 21, 2012, the highly reputable financial newspaper *Barron's* published a feature article entitled "No Margin for Error."[2]  The article noted FRAN's market-leading profit margins among specialty retailers, yet questioned whether the Company was getting "sweet deals from insiders who are also suppliers."  Specifically, the article stated the Company's outsized profit margins were unusual in the industry.  Typically,

---

[1] CCMP Capital Advisors, LLC ("CCMP") is a private equity firm specializing in buyouts and growth equity investments in companies ranging from $500 million to more than $3 billion in size.  CCMP acquired a controlling interest in Francesca's on March 1, 2010.  CCMP, which is headquartered in New York City, owned approximately 7.3 million shares of the Company's stock, or 16.4% of its then outstanding capital, all of which was sold in the Mar. 2013 SPO, which was conducted by Jefferies.

[2] Jacqueline Doherty, *No Margin for Error*, BARRON'S, (Apr. 21, 2012) *available at* http://online.barrons.com/article/SB50001424053111903835404577348202146910304.html

specialty retailers have gross margins of 42% to 44% and operating margins of roughly 10%; FRAN's margins were much higher at 52% and 21%, respectively.

10.     A March 27, 2013 article by *Barron's* entitled "Time to Say Ciao to Francesca's" expressed skepticism in "Francesca's ability to outperform, given its rapid expansion and cozy relationship with suppliers", and the difficulty "Francesca's may have in maintaining its sky-high margins."[3]  An August 28, 2013 *Seeking Alpha* article entitled "Francesca's: Investors In For Nasty Surprise Next Week" also scrutinized FRAN's ability to "maintain huge margins and spectacular growth."[4]

11.     Then, on September 4, 2013, prior to the opening of the stock market, FRAN released its fiscal second quarter earnings results whereby the Company announced that it missed earnings estimates and lowered its full-year profit forecast.  Same store sales at existing locations fell 1 percent in the quarter, compared to a 21 percent increase a year earlier.  FRAN blamed a lack of a dominant apparel fashion trend in the quarter and lower levels of customer traffic. Tellingly, Company insiders cashed out only months prior to disclosing FRAN's true prospects.

12.     In reaction to the disclosures of an earnings miss, deteriorating margins and lower full-year guidance, FRAN's share price plummeted almost 26% ($6.23 per share) from $24.02 per share on September 3, 2012 to $17.79 per share on September 4, 2013, wiping out $275 million in the Company's market capitalization in one-day.

13.     As further detailed below, throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about FRAN's

---

[3] Teresa Rivas, *Time to Say Ciao to Francesca's?*, BARRON'S, (March 27, 2013) *available at* http://online.barrons.com/article/SB50001424052748704882404578386354287020548.html

[4] Richard Pearson, *Francesca's: Investors In For Nasty Surprise Next Week*, SEEKING ALPHA, (Aug. 28, 2013) *available at* http://seekingalpha.com/article/1661052-francescas-investors-in-for-nasty-surprise-next-week?source=yahoo

business and financial condition. Specifically, Defendants made false and/or misleading statements and/or failed to disclose to FRAN investors that: (i) FRAN's disclosures regarding its margins, same store sales and related positive earnings were false and misleading, and were unsustainable; (ii) specifically, regarding the Company's same-store sales growth, the Company failed to acknowledge the impact weather and a competitive retail environment had, instead relying on new store openings to increase sales; (iii) the Company's relationship with certain vendors would be negatively impacted and result in lower margins upon CCMP's exit; (iv) FRAN dramatically increased promotional activity to meet financial targets, causing FRAN to lose its competitive profit margin edge which had partially supported the Company's high stock price; (v) FRAN concealed the Company's sales terms and margins with its largest suppliers, including Stony and KJK, companies owned by family members of FRAN's founding management, which could prevent FRAN's ability to maintain above-average profit margins; and (vi) as a result, the Company's financial statements were deficient and misleading at all relevant times.

14.    As a result of Defendants' false and/or misleading statements, FRAN shares traded at inflated prices during the Class Period. However, after disclosure of Defendant's false and/or misleading statements, FRAN shares suffered a precipitous decline in market value, thereby causing significant losses and damages to Plaintiffs and the other Class members.

## II.    JURISDICTION AND VENUE

15.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78(i)(b), 78(t) and 78t-1(a), and pendent common law claims, and §§11 and 15 of the Securities Act, 15 U.S.C. §§77k and 77o.

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1307, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

17.     Venue is proper in this Judicial District pursuant to §22 of the Securities Act and pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District. Additionally, many of the Underwriter Defendants maintain their executive offices and/or other offices within this Judicial District.  In connection with the acts and omissions alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.     THE SECURITIES ACT CLAIMS

### A.     PARTIES

#### 1.     Plaintiffs

18.     Plaintiff West Palm Beach Police Pension Fund, as set forth in the accompanying certification and incorporated by reference herein, purchased the publicly traded securities of FRAN pursuant and/or traceable to the Company's January 26, 2012 and April 17, 2012 secondary public offerings at artificially inflated prices during the Class Period, and has been damaged thereby.

19.     Plaintiff Taunton Contributory Retirement System, as set forth in the accompanying certification and incorporated by reference herein, purchased the publicly traded securities of FRAN pursuant and/or traceable to the Company's January 26, 2012, April 17, 2012

and March 27, 2013 secondary public offerings at artificially inflated prices during the Class Period, and has been damaged thereby.

### 2. **Securities Act Defendants**

#### (i) *The Company*

20.    Defendant FRAN is a company incorporated under the laws of Delaware, with its principle executive office located at 8760 Clay Road, Houston, Texas 77080.  All of its business operations are conducted through an indirect wholly-owned subsidiary, Francesca's Collections, Inc., ("Francesca's Collections") incorporated under the laws of Texas.  Francesca's Collections is wholly owned by Francesca's LLC (the "Parent"), a limited liability company formed and existing under the laws of the State of Delaware.  Parent is a wholly owned subsidiary of FRAN.

#### (ii) *The Officer and Director Defendants*

21.    Defendant John De Meritt ("De Meritt") is one of the founders of the Company. De Meritt served as President and Chief Executive Officer from March 2007 until December 2012.  He was a member of the Board of Directors from the inception of the Company until his retirement in December 2012.   Defendant De Meritt signed the Company's Registration Statement in connection with its Jan. 2012 SPO and Apr. 2012 SPO.  De Meritt signed and certified the Company's Form 10-K for the fiscal year ending January 28, 2012.[5]  Defendant De Meritt certified the accuracy of the statements and the effectiveness of the Company's internal controls in the 2012 First Quarter Form 10-Q[6], 2012 Second Quarter Form 10-Q[7], and the 2012 Third Quarter Form 10-Q[8].

---

[5] The Company's annual filing on Form 10-K filed with the SEC on March 21, 2012 for fiscal year ended January 28, 2012 ("Fiscal Year 2011 Form 10-K").

[6] The Company's quarterly filing on Form 10-Q filed with the SEC on June 8, 2012 for the period ending April 28, 2012 ("2012 First Quarter Form 10-Q").

22.     Defendant Neill P. Davis ("Davis") has served as the Chief Executive Officer of the Company since January 2013 and prior to then, as the Company's President from August 2012 to January 2013.   Defendant Davis served as a member of the Company's Board of Directors since May 2007.   Davis signed the Company's Registration Statement in connection with its Jan. 2012 SPO, Apr. 2012 SPO and Mar. 2013 SPO.   Defendant Davis also signed the Fiscal Year 2011 Form 10-K and the Form 10-K for the fiscal year ended February 2, 2013.[9] Additionally, Davis signed and certified the accuracy of the statements in the 2013 First Quarter Form 10-Q[10] and 2013 Second Quarter Form 10-Q,[11] as well as the effectiveness of the Company's internal controls.

23.     Defendant Gene Morphis ("Morphis") served as the Company's Chief Financial Officer from October 2010 until May 14, 2012.   Defendant Morphis signed the Company's Registration Statement in connection with its Jan. 2012 SPO and Apr. 2012 SPO.   Morphis also signed the Company's Fiscal Year 2011 Form 10-K.   Morphis was ultimately terminated from his position for "improperly" communicating company information through social media.

24.     Defendant Kyong Gill ("Gill") was a Founder, President and Executive Vice Chairperson at FRAN.   Gill signed the Company's Fiscal Year 2011 Form 10-K.   Defendant Gill

---

[7] The Company's quarterly filing on Form 10-Q filed with the SEC on September 4, 2012 for the period ending July 28, 2012 ("2012 Second Quarter Form 10-Q").

[8] The Company's quarterly filing on Form 10-Q filed with the SEC on December 7, 2012 for the period ending October 27, 2012 ("2012 Third Quarter Form 10-Q").

[9] The Company's annual filing on Form 10-K filed with the SEC on March 22, 2013 for fiscal year ended February 2, 2013 ("Fiscal Year 2012 Form 10-K").

[10] The Company's quarterly filing on Form 10-Q filed with the SEC on June 7, 2013 for the period ending May 4, 2013 ("2013 First Quarter Form 10-Q").

[11] The Company's quarterly filing on Form 10-Q filed with the SEC on September 5, 2013 for the period ending August 3, 2013 ("2013 Second Quarter Form 10-Q").

also signed the Company's Registration Statement in connection with its Jan. 2012 SPO and Apr. 2012 SPO.  Defendant Gill retired from the Company in June 2012.

25.     Defendant Mark Vendetti ("Vendetti") has served as the Chief Financial Officer and Senior Vice President of the Company since March 4, 2013.  Defendant Vendetti signed the Company's Registration Statement in connection with its Mar. 2013 SPO.  Defendant Vendetti also signed the Company's Fiscal Year 2012 Form 10-K.  Defendant Vendetti signed and certified the accuracy of the statements and the effectiveness of the Company's internal controls in the 2013 First Quarter Form 10-Q and the 2013 Second Quarter Form 10-Q.

26.     Defendant Greg Brenneman ("Brenneman") has served as a Director on the Company's Board of Directors since February 2010 and is Chairman of the Board.  He is a member of the Compensation Committee and the Nominating and Corporate Governance Committee.   Defendant Brenneman signed the Company's Registration Statement in connection with its Jan. 2012 SPO, Apr. 2012 SPO and Mar. 2013 SPO. Brenneman also signed the Company's Fiscal Year 2011 Form 10-K, Fiscal Year 2012 Form 10-K and the Company's proxy statement for FRAN's 2012 annual meeting of stockholders filed May 25, 2012. Brenneman has also been the Chairman of CCMP Capital Advisors, LLC since August 2008. Brenneman was a beneficial owner of shares held by the CCMP capital funds and sold in the Offerings.

27.     Defendant Patricia A. Bender ("Bender") has served as a Director on the Board of Directors since 2011.  She is a member of the Audit Committee and the Nominating and Corporate Governance Committee.   Defendant Bender signed the Company's Registration Statement in connection with its Jan. 2012 SPO, Apr. 2012 SPO and Mar. 2013 SPO.  Defendant

Bender also signed the Company's Fiscal Year 2011 Form 10-K and Fiscal Year 2012 Form 10-K.

28.     Defendant Rich Emmett ("Emmett") has served as a Director on the Board of Directors since November 2009.  He is a member of the Audit Committee and the Compensation Committee.  Defendant Emmett signed the Company's Registration Statement in connection with its Jan. 2012 SPO, Apr. 2012 SPO and Mar. 2013 SPO.  Defendant Emmett also signed the Company's Fiscal Year 2011 Form 10-K and Fiscal Year 2012 Form 10-K.

29.     Defendant Joseph Scharfenberger ("Scharfenberger") was a Director of the Board. Defendant Scharfenberger signed the Company's Fiscal Year 2011 Form 10-K.  Defendant Scharfenberger also signed the Company's Registration Statement in connection with its Jan. 2012 SPO and Apr. 2012 SPO.

30.     Defendant Richard Kunes ("Kunes") has served as a Director on the Board of Directors since February 2013.  He is a member of the Audit Committee and the Nominating and Corporate Governance Committee.  Defendant Kunes signed the Company's Registration Statement in connection with its Mar. 2013 SPO.  Defendant Kunes also signed the Company's Fiscal Year 2012 Form 10-K.

31.     Defendant Marie Toulantis ("Toulantis") has served as a Director on the Board of Directors since July 2012.  She is a member of the Audit Committee and Nominating and Corporate Governance Committee.  Defendant Toulantis signed the Company's Registration Statement in connection with its Mar. 2013 SPO.   Defendant Toulantis also signed the Company's Fiscal Year 2012 Form 10-K.

32.     Defendant Rich Zannino ("Zannino") has served as a Director on the Board of Directors since February 2010.  He is a member of the Compensation Committee and the

Nominating and Corporate Governance Committee.  Defendant Zannino signed the Company's Registration Statement in connection with its Jan. 2012 SPO, Apr. 2012 SPO and Mar. 2013 SPO.  Defendant Zannino also signed the Company's Fiscal Year 2011 Form 10-K and the Fiscal Year 2012 Form 10-K.  Zannino was a beneficial owner of CCMP shares sold in the Offerings.

33.     Defendants Davis, Morphis, Gill, Vendetti, Brenneman, Bender, Emmett, Kunes, Scharfenberger, Kunes, Toulantis and Zannino are collectively referred to herein as the "Officer and Director Defendants."  The Officer and Director Defendants served as FRAN's officers and/or directors during the Class Period, and are strictly liable under the Securities Act for endorsing the Company's false statements in the Offering Documents.

### (iii)   *The Underwriter Defendants*

34.     Defendant Goldman, Sachs & Co ("Goldman Sachs") acted as a representative for the underwriters in FRAN's Jan. 2012 SPO and Apr. 2012 SPO.   Goldman Sachs is headquartered at 200 West Street #200, New York, New York 10282.

35.     Defendant J.P. Morgan Securities LLC ("J.P. Morgan") acted as a representative for the underwriters in FRAN's Jan. 2012 SPO and Apr. 2012 SPO.   J.P. Morgan is headquartered in this District at 383 Madison Avenue, New York, New York 10179.

36.     Defendant Stifel, Nicolaus & Company, Incorporated ("Stifel") acted as an underwriter in FRAN's Jan. 2012 SPO and Apr. 2012 SPO.   Stifel is headquartered at One Financial Plaza, 501 North Broadway, St. Louis, Missouri 63102.

37.     Defendant KeyBanc Capital Markets Inc. ("KeyBanc") acted as an underwriter in FRAN's Jan. 2012 SPO and Apr. 2012 SPO.   KeyBanc is headquartered at 127 Public Square, Cleveland, Ohio 44114.

38.     Defendant RBC Capital Markets, LLC ("RBC") acted as an underwriter in the Apr. 2012 SPO.  RBC conducts substantial business from offices located at 1 Liberty Street New York, New York 10006.

39.     Defendant Jefferies & Company, Inc. ("Jefferies") acted as an underwriter in FRAN's Apr. 2012 SPO and Mar. 2013 SPO.  Jefferies is headquartered at 520 Madison Avenue, 10th Floor, New York, New York 10022.

40.     The Defendants listed above are sometimes referred to as the "Underwriter Defendants."  The Company, the Officer and Director Defendants, and the Underwriter Defendants are collectively referred to as the "Securities Act Defendants."

**B.     CLAIMS AGAINST THE SECURITIES ACT DEFENDANTS**

41.     On January 18, 2012, the Company filed its Form S-1 Registration Statement (the "Jan. 2012 Registration Statement").  That same day, a press release was issued announcing the pending follow-on offering of 9 million shares of common stock.  On January 24, 2012, an amendment to the Jan. 2012 Registration Statement was filed with the SEC.

42.     On January 26, 2012, FRAN completed its prospectus in connection with the Jan. 2012 SPO for the sale of the Company's shares at a price of $23.00 per share (the "Jan. 2012 Prospectus") pursuant to Rule 424(b)(1).  The Jan. 2012 Prospectus, the Jan. 2012 Registration Statement and all amendments are collectively referred to as the "Jan. 2012 Offering Documents".

43.     On April 4, 2012, the Company filed its Form S-1 Registration Statement (the "Apr. 2012 Registration Statement").  That same day, a press release was issued announcing the pending follow-on offering of 9 million shares of common stock.

44.     On April 16, 2012, an amendment to the Apr. 2012 Registration Statement was filed with the SEC.

45.     On April 17, 2012, FRAN completed its prospectus in connection with the Apr. 2012 SPO for the sale of the Company's shares at a price of $27.60 per share (the "Apr. 2012 Prospectus") pursuant to Rule 424(b)(1).  The Apr. 2012 Prospectus incorporated by reference the Fiscal Year 2011 Form 10-K, which the Company filed with the SEC on March 21, 2012.

46.     The Apr. 2012 Prospectus, the Apr. 2012 Registration Statement and all amendments are collectively referred to as the "Apr. 2012 Offering Documents".

47.     On March 26, 2013, FRAN filed its prospectus with the SEC in connection with the SPO for the sale of the Company's shares at a price of $28.65 per share (the "Mar. 2013 Prospectus").  Also on March 26, 2013, the Company filed its Form S-3 Registration Statement (the "Mar. 2013 Registration Statement").  The Mar. 2013 SPO was conducted pursuant to an effective shelf registration statement.

48.     On March 28, 2013 the Company filed its completed Prospectus Supplement to the Prospectus dated March 26, 2013 pursuant to Rule 424(b)(7).

49.     The Mar. 2013 Prospectus incorporated by reference the Fiscal Year 2012 Form 10-K, which the Company filed with the SEC on March 22, 2013; portions of the proxy statement for the Company's 2012 annual meeting of stockholders filed with the SEC on May 25, 2012 incorporated by reference FRAN's Form 10-K for the year ended January 28, 2012; the Company's current reports on Form 8-K filed on February 12, 2013 and March 1, 2013 (in relevant part); and the description of FRAN's common stock contained in the registration statement on Form 8-A filed on July 14, 2011.

50.     The Mar. 2013 Prospectus, Mar. 2013 Registration Statement and all supplements and/or amendments are collectively referred to as the "Mar. 2013 Offering Documents".

51.     The Company offered 7,394,727 shares in the Mar. 2013 SPO, at a price of $28.36 per share, which was estimated to result in $209,714,458 of proceeds to the selling stockholders before expenses.

52.     The Jan. 2012 Offering Documents, Apr. 2012 Offering Documents and the Mar. 2013 Offering Documents are collectively referred to as the "Offering Documents."

53.     The Offering Documents contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing its preparation.

54.     In the Offering Documents, FRAN touted its ability for growth.  In particular, the Mar. 2013 Offering Documents stated the following:

> By offering a differentiated shopping experience and high-quality merchandise at *a compelling value*, our boutiques have been s*uccessful across a wide variety of geographic markets and shopping venues*. We believe we have an opportunity to *continue to grow* our boutique base from 360 locations in 44 states as of February 2, 2013 to approximately 900 boutiques in the United States over the next eight years based on our flexible boutique format, *the financial characteristics of our boutiques* and our ongoing analysis of shopping venues that meet our criteria for new boutiques. Our merchandise is also available through our website, *www.francescas.com.*

55.     The Mar. 2013 Offering Documents included the following financial data:

| | Fiscal Year Ended | | |
|---|---|---|---|
| | February 2, 2013 | January 28, 2012 | January 29, 2011 |
| | (in thousands, except share and per share amounts) | | |
| Net sales[(1)] | $ 296,373 | $ 204,158 | $ 135,176 |
| Cost of goods sold and occupancy costs[(2)] | 137,873 | 97,365 | 65,008 |
| Gross profit | 158,500 | 106,793 | 70,168 |
| Selling, general and administrative expenses | 80,560 | 63,262 | 40,525 |
| Income from operations | 77,940 | 43,531 | 29,643 |
| Interest income (expense) | (672) | (4,868) | (1,633) |
| Loss on early extinguishment of debt | — | (1,591) | — |
| Other income (expense) | 230 | 284 | (2) |
| Income before income tax expense | 77,498 | 37,356 | 28,008 |
| Income tax expense | 30,437 | 14,855 | 11,113 |

| | | | | | |
|---|---|---|---|---|---|
| Net income | $ | 47,061 | $ | 22,501 | $ | 16,895 |
| Basic earnings per common share[3] | $ | 1.08 | $ | 0.53 | $ | 0.43 |
| Diluted earnings per common share[3] | $ | 1.05 | $ | 0.52 | $ | 0.41 |
| Dividends declared per common share | | — | | — | $ | 2.39 |
| **Weighted average shares outstanding** | | | | | | |
| Basic shares | | 43,744 | | 42,087 | | 39,385 |
| Diluted shares | | 44,807 | | 42,948 | | 40,907 |

| | As of Fiscal Year Ended | | |
|---|---|---|---|
| | February 2, 2013 | January 28, 2012 | January 29, 2011 |
| | (in thousands, except percentages) | | |
| **Consolidated Balance Sheet Data:** | | | |
| Total current assets | $   59,106 | $   36,041 | $   31,721 |
| Total assets | 112,595 | 72,312 | 59,124 |
| Long-term debt | — | 22,000 | 87,875 |
| Total liabilities | 40,538 | 55,410 | 114,592 |
| Convertible redeemable preferred stock – series A | — | — | — |
| Total stockholders' equity (deficit) | 72,057 | 16,902 | (55,468) |
| **Operating Data:** | | | |
| Comparable boutique sales growth for period[4] | 14.9% | 10.4% | 15.2% |
| Number of boutiques open at end of period (not in thousands) | 360 | 283 | 207 |
| Net sales per average square foot for period (not in thousands)[5] | $   632 | $   554 | $   508 |
| Average square feet (not in thousands)[6] | 1,385 | 1,409 | 1,428 |
| Total gross square feet at end of period | 499 | 399 | 296 |

56.     With respect to the Company's relationship with CCMP, the Offering Documents detailed the conflicts of interest that existed.  In regards to the CCMP and FRAN's relationship, the following was stated in pertinent part in the Mar. 2013 Offering Documents:

> While CCMP will no longer own shares of our common stock after the completion of this offering, representatives of CCMP and its affiliates will continue to occupy two seats on our board of directors. CCMP is in the business of making investments in companies and may from time to time acquire and hold interests in businesses that compete directly or indirectly with us. In addition, corporate opportunities may arise in the area of potential acquisitions of competitive businesses that may be attractive to us as well as to CCMP or its affiliates.

> CCMP and the members of our board of directors who are affiliated with CCMP, by the terms of our amended and restated certificate of incorporation, are not required to offer us any transaction opportunity of which they become aware and could take any such opportunity for themselves or offer it to other companies in

15

which they have an investment, unless such opportunity is expressly offered to them solely in their capacity as our directors. The company, by the terms of our amended and restated certificate of incorporation, expressly renounces any interest in any such corporate opportunity to the extent permitted under applicable law, even if the opportunity is one that we would reasonably be deemed to have pursued if given the opportunity to do so. Our amended and restated certificate of incorporation cannot be amended to eliminate the company's renunciation of any such corporate opportunity arising prior to the date of any such amendment. CCMP or its affiliates may also acquire competing businesses that may not be attractive to us, and have no obligation to refrain from acquiring competing businesses. Any competition could intensify if an affiliate or subsidiary of CCMP were to enter into or acquire a business similar to our specialty retail operations. CCMP or its affiliates may enter into or acquire a competing business in the future.

57.     The Jan. 2012 Offering Documents and the Apr. 2012 Offering Documents

provided information as to the Company's sourcing strategy.     The Apr. 2012 Offering

Documents stated the following in pertinent part:

> ***Our ability to quickly make decisions on trend-right items combined with the short production lead times of our vendors maximizes our speed to market.*** We use vendors based in the United States that source from both domestic and overseas markets and it generally takes only four to twelve weeks from the time an order is placed to the time merchandise is available on the boutique floor. ***With these short lead times, we are able to make more informed buying decisions in terms of customers' merchandise expectations, and to quickly react to changing fashion trends***. This also supports our merchandise strategy of offering a broad but limited assortment that is infused with new items five days a week. Due to the limited quantity of our buys in any one style, we avoid material inventory positions in individual styles and this enhances our ability to quickly deliver trend-right merchandise and minimizes the risk of fashion misses, which can lead to increased inventory markdowns and diminished gross margins.

> We do not own or operate any manufacturing facilities. ***We have relationships with a diverse base of over 200 vendors and our top 10 vendors sourced approximately 42% of our merchandise in fiscal year 2011, while no single vendor accounted for more than 15% of our purchases. KJK Trading Corporation ("KJK Trading") was our largest vendor in both fiscal years 2011 and 2010.*** We are KJK Trading's sole customer. KJK Trading is owned and operated by Ki Juing Gu. Mr. Gu is the brother-in-law of Ms. Insuk Koo (one of our Founders). Although KJK Trading assists us in the design of apparel items, KJK Trading does not act as our broker or agent in the sourcing of our merchandise. We select merchandise for purchase from KJK Trading after being presented with a variety of new styles identified by KJK Trading. ***Stony Leather,***

16

*Inc. ("Stony") was our second largest vendor in fiscal years 2011 and 2010. In addition to us, Stony has several other customers.* Chong Yi and Insuk Koo (two of the four Founders) own and operate Stony. Mr. Yi and Ms. Koo along with their sister Ms. Kyong Gill (our Executive Vice Chairperson and one of the four Founders) are stockholders of Francesca's. Stony provides the sourcing for jewelry, accessories and gift items. Both KJK Trading and Stony maintain separate offices and employees as third-party vendors. See "Certain Relationships and Related Party Transactions — Related Party Transactions — Stony Trading Relationship" and "Certain Relationships and Related Party Transactions — Related Party Transactions — KJK Trading Relationship" for additional discussions of our relationship with these vendors.

*We do not enter into exclusive contracts with our vendors and we continue to expand our vendor network. This provides us with access to an even more extensive variety of merchandise from a greater number of vendors at competitive prices.* We believe our vendors view us as an important retail partner given our growth and market position. Our vendors utilize a network of domestic and overseas factories, providing them access to significant capacity. We source our inventory primarily from domestic vendors.

Each of our vendors is required to adhere to our vendor standards, which are designed to ensure that our vendors conduct their business in a legal, ethical and responsible manner. This also includes the requirement that all of our vendors comply with the applicable laws and regulations of the United States, those of the respective country of manufacture or exportation and all state and local laws and regulations.

58.     The Jan. 2012 Offering Documents and the Apr. 2012 Offering Documents also provided additional information as to the Company's relationship with Stony and KJK. The Apr. 2012 Offering Documents stated the following in pertinent part:

*Stony Trading Relationship*

Stony Leather, Inc. ("Stony") is one of our inventory vendors. We purchase inventory from Stony on a purchase order basis. Stony sources, wholesales and distributes jewelry, accessories, handbags and gift items. Stony's customers include retailers, wholesalers, individuals, television shopping networks, and internet-based merchants. *We are only one of Stony's several customers.* Stony is based in Houston, Texas with a showroom in New York City, New York. Stony does not own or operate conventional brick and mortar retail outlets.

Chong Yi and Insuk Koo (two of the four Founders) own and operate Stony. Mr. Yi and Ms. Koo are brother and sister. Mr. Yi and Ms. Koo along with their sister Ms. Kyong Gill (our Executive Vice Chairperson and one of the four Founders) are stockholders of Francesca's. *We treat Stony as an independent third-party vendor.*

Since the founding of our company, Stony has been a supplier of a variety of our inventory items. Stony has accounted for 7%, 10% and 12% of our total inventory purchases on an annual basis in fiscal years 2011, 2010 and 2009, respectively. *We negotiate and set the rates for the merchandise and services provided to us by Stony at market rates for such merchandise and services at the time each such transaction is entered into. We often request and receive from Stony merchandise on special order or modify previously ordered merchandise. Generally, Stony provides us a 3% damage allowance to cover the costs of damaged merchandise.* The Stony inventory purchases during fiscal years 2011, 2010 and 2009 were approximately $5.0 million, $5.0 million and $3.1 million, respectively.

### *KJK Trading Relationship*

KJK Trading Corporation ("KJK Trading") is one of our inventory vendors. We purchase inventory from KJK Trading on a purchase order basis. *Although KJK Trading assists us in the design of several items of apparel we sell in our boutiques, KJK Trading does not act as our broker or agent in the sourcing of our merchandise.* Beginning in May 2010, we subleased approximately 2,000 square feet of office space to KJK Trading within our headquarters in Houston, Texas. *We did not receive any rent payments from KJK Trading in fiscal year 2010. Beginning in January 2011, the rent payment became $1,000 per month. KJK Trading employs several employees to conduct its business. We are the sole customer of KJK Trading. We treat KJK Trading as an independent third-party vendor.*

KJK Trading is owned and operated by Ki Juing Gu. Mr. Gu is the brother-in-law of Ms. Insuk Koo (one of our Founders).

KJK Trading has been one of our inventory vendors since 2008. KJK Trading has accounted for 12%, 13% and 11% of our total inventory purchases on an annual basis in fiscal year 2011, fiscal year 2010 and fiscal year 2009, respectively. We negotiate and set the rates for the merchandise and services provided to us by KJK Trading at market rates for such merchandise and services at the time each such transaction is entered into. *We often request and receive from KJK Trading merchandise on special order or modify previously ordered merchandise. Generally, KJK Trading provides us a 1% damage allowance to cover the costs of damaged merchandise*. The KJK Trading inventory purchases during fiscal years 2011, 2010 and 2009 were approximately $8.1 million, $6.6 million and $2.8 million, respectively.

59.    The statements in the Offering Documents were materially false and misleading and failed to disclose that: (i) FRAN's disclosures regarding its margins, same store sales and related positive earnings were false, misleading and unsustainable; (ii) specifically, regarding the

Company's same-store sales growth, the Company failed to acknowledge the impact weather and a competitive retail environment had, instead relying on new store openings to increase sales; (iii) the Company's relationship with certain vendors would be negatively impacted and result in lower margins upon CCMP's exit; (iv) FRAN dramatically increased promotional activity to meet financial targets, causing FRAN to lose its competitive profit margin edge which had partially supported the Company's high stock price; (v) FRAN concealed the Company's sales terms and margins with its largest suppliers, including Stony and KJK, companies owned by family members of FRAN's founding management, which could prevent FRAN's ability to maintain above-average profit margins; and (vi) as a result, the Company's financial statements were deficient and misleading at all relevant times.

## IV.  COUNTS AGAINST SECURITIES ACT DEFENDANTS RELATED TO THE OFFERINGS

### COUNT I
### FOR VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT
### AGAINST THE SECURITIES ACT DEFENDANTS

60.     Plaintiffs incorporate the allegations contained above pertaining to the false Offering Documents.  Plaintiffs repeat and alleges Sections I, II, III, VIA., and XIII, as if fully set forth herein.  For purposes of Counts I and II, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as these counts are based solely on claims of strict liability and/or negligence under the Securities Act.

61.     This Count is brought against the Securities Act Defendants on behalf of all persons or entities who purchased FRAN stock issued pursuant or traceable to the January 26, 2012 SPO, the April 17, 2012 SPO and/or the March 27, 2013 SPO.  The Offering Documents for the Offerings were inaccurate and misleading, contained untrue statements of material facts,

omitted to state other facts necessary to make the statements made not misleading, and concealed and failed adequately to disclose material facts, as described above.

62.     The Securities Act Defendants are strictly liable for the misstatements and omissions and for the damages that Plaintiffs and the other members of the Class have sustained thereby.  The Securities Act Defendants are responsible for the contents and dissemination of the Offering Documents, and did not conduct a reasonable investigation or possess reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading.

63.     The Securities Act Defendants issued, caused to be issued and participated in the issuance of materially false and misleading written statements to the investing public that were contained in the Offering Documents, which misrepresented or failed to disclose, among other things, the facts set forth above.  By reasons of the conduct herein alleged, each Section 11 Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

### COUNT II
**FOR VIOLATIONS OF SECTION 12(A)(2) OF THE SECURITIES ACT**
**AGAINST DEFENDANT FRAN AND THE UNDERWRITER DEFENDANTS**

64.     Plaintiffs incorporate the allegations contained above pertaining to the false Offering Documents.  Plaintiffs repeat and reallege Sections I, II, III, VI.A., and XIII, as if fully set forth herein.  For purposes of Counts I and II, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as these counts are based solely on claims of strict liability and/or negligence under the Securities Act.

65.     This Count is brought against the Underwriter Defendants and FRAN on behalf of all persons or entities who purchased FRAN stock issued pursuant or traceable to the January 26,

2012 SPO, the April 17, 2012 SPO and/or the March 27, 2013 SPO. The Company and the Underwriter Defendants were sellers, offerors, and/or solicitors of purchasers of the shares offered pursuant to the Offering Documents.

66.     The Offering Documents contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts. The Company and the Underwriter Defendants' actions of solicitation included participating in the preparation and dissemination of the false and misleading Offering Documents.

67.     Defendant FRAN and the Underwriter Defendants owed to the purchasers of FRAN's common stock, including Plaintiffs and the other members of the Class, the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. FRAN and the Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the Offering Documents, as set forth above.

68.     Plaintiffs and the other members of the Class purchased or otherwise acquired FRAN's securities pursuant to and/or traceable to the defective Offering Documents. Plaintiffs did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Offering Documents.

69.     Plaintiffs, individually and representatively, hereby offers to tender to the FRAN and the Underwriter Defendants that stock which Plaintiffs and the other Class members continue to own, on behalf of all members of the Class who continue to own such stock, in return

for the consideration paid for that stock, together with interest thereon.  Class members who have

sold their FRAN stock are entitled to rescissory damages.

70.     By reason of the conduct alleged herein, these defendants violated and/or

controlled a person who violated §12(a)(2) of the Securities Act.  Accordingly, Plaintiffs and the

other members of the Class who hold FRAN securities purchased in the SPOs have the right to

rescind and recover the consideration paid for their FRAN securities, and hereby elect to rescind

and tender their FRAN securities to the FRAN and the Underwriter Defendants sued herein.

Plaintiffs and the other Class members who have sold their FRAN securities are entitled to

rescissory damages.

71.     This action is brought within three years from the time that the securities upon

which this Count is brought were sold to the public, and within one year from the time when

Plaintiffs discovered or reasonably could have discovered the facts upon which this Count is

based.

## COUNT III
### FOR VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT
### AGAINST THE OFFICER AND DIRECTOR DEFENDANTS

72.     Plaintiffs incorporate the allegations contained above pertaining to the false

Offering Documents.  Plaintiffs repeats and alleges Sections I, II, III, VI.A., and XIII, as if fully

set forth herein.  This Count is brought against the Officer and Director Defendants, each of

whom was a controlling person of FRAN by virtue of their position as directors and/or senior

officers of FRAN, and/or by virtue of their status as a major shareholder of the Company.

73.     This Claim is brought against the Officer and Director Defendants pursuant to

Section 15 of the Securities Act, 15 U.S.C. §77o, on behalf of all persons or entities who

purchased FRAN stock issued pursuant or traceable to the January 26, 2012 SPO, the April 17, 2012 SPO and/or the March 27, 2013 SPO.

74.     The Company is liable under Section 11 of the Securities Act as set forth in Count I herein with respect to the SPO.

75.     Each of the Officer and Director Defendants was a control person of the Company with respect to the SPO by virtue of that individual's position as a senior executive officer and/or director of the Company.  These Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of FRAN.  By reason of their positions within the Company and/or their stock ownership and/or because of their positions on FRAN's Board of Directors, the Officer and Director Defendants had the requisite power to directly or indirectly control or influence the specific corporate policies that resulted in the unlawful acts and conduct alleged in Count I.

76.     Each of the Officer and Director Defendants was a culpable participant in the violations of Section 11 of the Securities Act alleged in Count I above, based on their having signed the Offering Documents and having otherwise participated in the process that allowed the SPOs to be successfully completed.  These Defendants, by virtue of their managerial and/or board positions with the Company, controlled the Company, as well as the contents of the Offering Documents, at the time of the SPO.  Each of the Officer and Director Defendants was provided with or had unlimited access to copies of the Offering Documents, and had the ability to either prevent their issuance or cause them to be corrected.

77.     As a result, the Officer and Director Defendants are liable under Section 15 of the Securities Act for the Company's primary violation of Section 11 of the Securities Act.

78.     By virtue of the foregoing, Plaintiffs and the other members of the Class who purchased or otherwise acquired the Company's common stock pursuant and/or traceable to the SPOs are entitled to damages against the Individual Defendants.

## V.     CLAIMS UNDER THE EXCHANGE ACT

### A.     PARTIES

#### 1.     Plaintiffs

79.     Plaintiff West Palm Beach Police Pension Fund, as set forth in the accompanying certification and incorporated by reference herein, purchased FRAN stock during the Class Period, and was damaged thereby.

80.     Plaintiff Taunton Contributory Retirement System, as set forth in the accompanying certification and incorporated by reference herein, purchased FRAN stock during the Class Period, and was damaged thereby.

#### 2.     Defendants

##### (i)     *The Company*

81.     As described above, Defendant FRAN is a company incorporated under the laws of Delaware with its principle executive offices located in Houston, Texas.

##### (ii)     *The Individual Defendants*

82.     Defendant Davis has served as the Chief Executive Officer of the Company since January 2013 and prior to then, as the Company's President since August 2012.  Defendant Davis has served as a member of the Company's Board of Directors since May 2007.

83.     Defendant Vendetti has served as the Chief Financial Officer, Senior Vice President of the Company since joining the Company in March 2013.

84.     Defendant Zannino has served as a Director on the Board of Directors since February 2010.  He is a member of the Compensation Committee and the Nominating and Corporate Governance Committee.  Zannino was a beneficial owner of CCMP's FRAN shares sold in the Offerings.

85.     Defendant Brenneman has served as a Director on the Company's Board of Directors since February 2010, and is Chairman of the Board.  He is member of the Compensation Committee and the Nominating and Corporate Governance Committee.

86.     Defendant Cynthia Thomassee ("Thomassee") has served as the Company's Vice President of Accounting since May 2010 and Controller since December 2007.  Thomassee served as Interim Chief Financial Officer from May 2012 until March 2013.   Defendant Thomassee signed the Company's false and misleading 2012 First Quarter Form 10-Q, 2012 Second Quarter Form 10-Q and 2012 Third Quarter Form 10-Q.  In addition, Thomassee falsely certified the accuracy of the statements in the 2012 First Quarter Form 10-Q, 2012 Second Quarter Form 10-Q, 2012 Third Quarter Form 10-Q, as well as the effectiveness of the Company's internal controls.

87.     Defendant John De Meritt served as President and Chief Executive Officer from March 2007 until December 2012.

88.     Defendant Gene Morphis served as the Company's Chief Financial Officer from October 2010 until May 14, 2012.

89.     Defendant Theresa Backes ("Backes") has served as the President and Chief Operating Officer since January 1, 2013, and prior to that as the Executive Vice President and Chief Operating Officer since joining the Company in 2007.  Defendant Backes sold 114,996 shares in the Mar. 2013 SPO, receiving more than $3.2 million in proceeds.

90.     Defendant Kal Malik ("Malik") is the Executive Vice President, Chief Administrative Officer and General Counsel of the Company.  He has served as General Counsel since October 2009 and as Chief Administrative Officer since December 2012. Defendant Malik signed all of the Company's Press Releases filed with the SEC, and made false and misleading statements during the Relevant Period.

91.     Defendant Sei Jin Alt ("Alt") is, and was throughout the Class Period, FRAN's Executive Vice President and Chief Merchandising Officer.  Defendant Alt sold 16,000 shares in the Mar. 2013 SPO, receiving $453,760 in proceeds.

92.     Defendant Randi Sonenshein ("Sonenshein") is, and was throughout the Class Period, FRAN's Vice President, Finance and Investor Relations.  Defendant Sonenshein sold 16,000 shares in the Mar. 2013 SPO, receiving $453,760 in proceeds.

93.     For purposes of Plaintiffs' Exchange Act claims, Defendants Davis, Zannino, Brenneman, Vendetti, Thomassee, De Meritt, Morphis Backes, Alt, Sonenshein and Malik are referred to as the "Individual Defendants."

94.     FRAN and the Individual Defendants are referred to as the "Exchange Act Defendants."  The Securities Act Defendants and the Exchange Act Defendants are collectively referred to as "Defendants."

95.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of FRAN, were privy to confidential, proprietary, and material adverse non-public information concerning FRAN, its operations, finances, financial condition and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information

provided to them in connection therewith.  Because of their possession of such information, the

Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had

not been disclosed to, and were being concealed from, the investing public.

96.     The Individual Defendants are liable as direct participants in the wrongs

complained of herein.  In addition, the Individual Defendants, by reason of their status as senior

executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of

the Exchange Act, and had the power and influence to cause the Company to engage in the

unlawful conduct complained of herein.  Because of their positions of control, the Individual

Defendants were able to and did, directly or indirectly, control the conduct of FRAN's business.

97.     The Individual Defendants, because of their positions with the Company,

controlled and/or possessed the authority to control the contents of its reports, press releases and

presentations to securities analysts and through them, to the investing public.  The Individual

Defendants were provided with copies of the Company's reports and publicly disseminated

documents alleged herein to be misleading, prior to or shortly after their issuance and had the

ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the

Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

98.     As senior executive officers and/or directors, and as controlling persons of a

publicly traded company whose securities were, and are, registered with the SEC pursuant to the

Exchange Act, and were traded on the NASDAQ and governed by the federal securities laws, the

Individual Defendants had a duty to disseminate promptly accurate and truthful information with

respect to FRAN's financial condition and performance, growth, operations, financial statements,

business, products, markets, management, earnings, and present and future business prospects, to

correct any previously issued statements that had become materially misleading or untrue, so the

market price of FRAN's securities would be based on truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

99.     The Individual Defendants are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of FRAN's publicly traded securities by disseminating materially false and misleading statements and/or concealing material adverse facts.

## VI.     SUBSTANTIVE ALLEGATIONS

### A.     BACKGROUND OF FRAN

100.     FRAN is a specialty retailer offering a differentiated shopping experience to women through its mix of apparel, jewelry, accessories and gifts. The Company's boutiques carry a broad selection but limited quantities of individual styles with new merchandise introduced five days a week.

101.     The Company was founded in 1999 and opened its first boutique in Houston, Texas that same year. Initially, FRAN was focused on selling fashion jewelry, accessories and selected home décor. As the Company's boutique base grew across the United States, it expanded its merchandise offering to include apparel, which has become its largest category.

102.     The Company claims that because it offers a sophisticated selection in a boutique setting and high-quality merchandise at attractive prices. FRAN boutiques have been successful across a wide variety of geographic markets and shopping venues.

103.     FRAN's strengths are listed by the Company as including: (i) proven trend-right merchandise delivered at a compelling value; (ii) a differentiated shopping experience; (iii)

powerful boutique economics and rigorous real estate selection process; (iv) a solid and scalable infrastructure; and (v) an experienced management team with a disciplined operating philosophy.

104.     In February 2010, CCMP paid $209 million to buy an 84 percent stake in FRAN, then a privately-held company, from Bear Growth Capital Partners LP and FRAN's founders Defendant De Meritt, Defendant Gill, Insuk Koo and Chong Yi.  On March 1, 2010, CCMP and FRAN issued a joint press release announcing that CCMP had acquired a controlling interest in FRAN and that the founders would have continued involvement in FRAN's management.

105.     In July 2011, FRAN was taken public through an initial public stock offering..  At that time, CCMP and its affiliates owned more than 34 million shares of the Company's common stock, of which they sold more than 6 million shares in the IPO, leaving CCMP with approximately 28 million shares, or 64.4% of the Company's outstanding capital.  The shares were sold for $17 in the IPO, with CCMP receiving $95.7 million in net proceeds.

106.     FRAN's two largest vendors in fiscal years 2011 and 2012 were KJK Trading ("KJK") and Stony Leather ("Stony").  These two vendors are owned and operated by certain family members of Defendant Gill.  FRAN maintains no supply contracts with these vendors.

107.     KJK accounted for 12% of the Company's total inventory purchases from the beginning of fiscal year 2012 through July 10, 2012.  Notably, FRAN is KJK's sole customer and KJK leases space in FRAN's headquarters.  Prior to the IPO, KJK did not pay rent to FRAN for the space.  After the IPO, a nominal amount of $1,000 was set for rent.

108.     Stony has been a supplier of a variety of inventory items to FRAN since its founding.  Stony accounted for 10% of the Company's total inventory purchases from the beginning of fiscal 2012 through July 10, 2012.  Combined, these two suppliers accounted for 22% of the Company's inventory purchases.

109.    In January 2012, CCMP sold over 10 million shares of FRAN common stock in a secondary public offering underwritten by Goldman, Sachs & Co., J.P. Morgan, Stifel Nicolaus Weisel, and Keybanc Capital Markets.   These shares were sold for $23 per share in the secondary public offering, with CCMP receiving $22.08 per share, or $222.1 million in net proceeds.

110.    In April 2012, CCMP sold another 8.465 million shares of FRAN common stock, leaving CCMP with 7.248 million shares.   The shares were sold for $27.60 per share , with CCMP receiving $233.6 million in net proceeds after deducting underwriting fees and expenses.

111.    FRAN had market-leading profit margins among specialty retailers.   Typically, specialty retailers have gross margins of 42% to 44% and operating margins of roughly 10%; FRAN's margins were much higher at 52% and 21%, respectively.

112.    However, those margins were inflated.   Company insiders knew the numbers were too good to be true and as a result, Defendants created a materially false and misleading perception in the market regarding FRAN's purportedly strong financial and operational condition, as well as the Company's promising future prospects.   In reality, Defendants knew or should have known that the only plausible result from their misconduct would be substantial losses for the Company's investors.

### B.    FALSE AND MISLEADING STATEMENTS

113.    The Class Period begins on January 10, 2012.   Prior to the opening of the markets, FRAN released the following press release reporting "strong holiday period sales and margin performance."

> Francesca's Holdings announced net sales for the two-month period ended December 31, 2011 *increased 52.7% to $49.2 million* compared to $32.2 million for the same period of 2010. Comparable boutique sales *increased 14.1%* for the two-month period of 2011 following a comparable boutique sales increase of 15.6% in the same period of 2010.

Based on the results to date, the Company now expects net sales for the fourth quarter in the range of $58.5 to $59.5 million assuming a comparable boutique sales increase of 9% to 11% following a 14.5% increase in the same period last year. The Company now expects net income for the quarter to be in the range of $7.1 million to $7.6 million or $0.16 to $0.17 per diluted share compared to $0.11 per share in the fourth quarter of the prior year. Previously released guidance for the fourth quarter included estimated net sales of $55.5 to $57.0 million and diluted earnings per share of $0.14 to $0.15, based on an estimated comparable boutique sales increase of 4% to 5%.

John De Meritt, President and CEO stated: "*We are very pleased with our strong sales and margin results for the holiday season, which we believe is a reflection of our effective merchandising strategy, strong value proposition and differentiated boutique shopping experience.* We achieved this sales growth without sacrificing our merchandise margin. We believe our inventory remains at an appropriate level as we move into 2012. In addition, our new boutiques are performing in line with our expectations as we continue to execute successfully on our real estate strategy."

114.     On January 18, 2012, the Company filed its Jan. 2012 Registration Statement. That same day, a press release was issued announcing the pending follow-on offering of 9 million shares of common stock.   On January 24, 2012, an amendment to the Jan. 2012 Registration Statement was filed with the SEC.

115.     On January 26, 2012, FRAN completed its prospectus in connection with the Jan. 2012 SPO for the sale of the Company's shares at a price of $23.00 per share pursuant to Rule 424(b)(1).

116.     On March 13, 2012, FRAN issued a press release announcing its financial results for fiscal fourth quarter and fiscal year ended January 28, 2012.  The press release revealed that for the fiscal fourth quarter, net sales increased 54.6%, comparable boutique sales increased 14.7% and "income from operations increased 62.3% to $14.5 million compared to $8.9 million in the same prior year period."  In regards to the fiscal year comparisons, highlights include the following:

Net sales increased 51.0% to $204.2 million from $135.2 million in the prior year. Comparable boutique sales increased 10.4% following a 15.2% increase in the prior year.

Gross margin was 52.3% compared to 51.9% in the prior year (with pro forma adjustment the prior year was 52.4%). Gross margin benefitted from a favorable sales mix and leveraging occupancy costs.

Income from operations grew by 46.8% to $43.5 million from $29.6 million in the prior year. Results for the year include a $2.3 million charge associated with the accelerated recognition of stock-based compensation expense and $0.6 million of expenses associated with the Company's secondary offering. Income from operations as a percentage of net sales was 21.3% compared to 21.9% in the prior year. Adjusting for the accelerated stock-based compensation and offering expense, income from operations was 22.7% as a percentage of net sales. The corresponding prior year pro forma amount was 24.2%

Interest expense was $4.9 million compared to $1.6 million in the prior year.

Net income was $22.5 million, or $0.52 per diluted share based on 42.9 million weighted average shares outstanding. This compares to net income of $16.9 million, or $0.41 per diluted share based on 40.9 million weighted average shares outstanding.

117.    On March 21, 2012, FRAN filed with the SEC its annual report on Form 10-K for the fiscal year ended January 28, 2012.  The Company's Fiscal Year 2011 Form 10-K was signed by Defendants De Meritt, Morphis, Brenneman, Gill, Bender, Davis, Emmett, Scharfenberger and Zannino, and reiterated the Company's financial results announced on March 13, 2013.

118.    On April 4, 2012, the Company filed its Form S-1 Registration Statement.  That same day, a press release was issued announcing the pending follow-on offering of 9 million shares of common stock.  On April 16, 2012, an amendment to the Apr. 2012 Registration Statement was filed with the SEC.

119.    On April 17, 2012, FRAN completed its prospectus in connection with the Apr. 2012 SPO for the sale of the Company's shares at a price of $27.60 per share pursuant to Rule 424(b)(1).  The Apr. 2012 Prospectus incorporated by reference the Fiscal Year 2011 Form 10-K, which the Company filed with the SEC on March 21, 2012.

120.    The Jan. 2012 Offering Documents and the Apr. 2012 Offering Documents provided information as to the Company's sourcing strategy.    The Apr. 2012 Offering Documents stated the following in pertinent part:

*Our ability to quickly make decisions on trend-right items combined with the short production lead times of our vendors maximizes our speed to market.* We use vendors based in the United States that source from both domestic and overseas markets and it generally takes only four to twelve weeks from the time an order is placed to the time merchandise is available on the boutique floor. *With these short lead times, we are able to make more informed buying decisions in terms of customers' merchandise expectations, and to quickly react to changing fashion trends*. This also supports our merchandise strategy of offering a broad but limited assortment that is infused with new items five days a week. Due to the limited quantity of our buys in any one style, we avoid material inventory positions in individual styles and this enhances our ability to quickly deliver trend-right merchandise and minimizes the risk of fashion misses, which can lead to increased inventory markdowns and diminished gross margins.

We do not own or operate any manufacturing facilities. *We have relationships with a diverse base of over 200 vendors and our top 10 vendors sourced approximately 42% of our merchandise in fiscal year 2011, while no single vendor accounted for more than 15% of our purchases. KJK Trading Corporation ("KJK Trading") was our largest vendor in both fiscal years 2011 and 2010.* We are KJK Trading's sole customer. KJK Trading is owned and operated by Ki Juing Gu. Mr. Gu is the brother-in-law of Ms. Insuk Koo (one of our Founders). Although KJK Trading assists us in the design of apparel items, KJK Trading does not act as our broker or agent in the sourcing of our merchandise. We select merchandise for purchase from KJK Trading after being presented with a variety of new styles identified by KJK Trading. *Stony Leather, Inc. ("Stony") was our second largest vendor in fiscal years 2011 and 2010. In addition to us, Stony has several other customers.* Chong Yi and Insuk Koo (two of the four Founders) own and operate Stony. Mr. Yi and Ms. Koo along with their sister Ms. Kyong Gill (our Executive Vice Chairperson and one of the four Founders) are stockholders of Francesca's. Stony provides the sourcing for jewelry, accessories and gift items. Both KJK Trading and Stony maintain separate offices and employees as third-party vendors. See "Certain Relationships and Related Party Transactions — Related Party Transactions — Stony Trading Relationship" and "Certain Relationships and Related Party Transactions — Related Party Transactions — KJK Trading Relationship" for additional discussions of our relationship with these vendors.
*We do not enter into exclusive contracts with our vendors and we continue to expand our vendor network. This provides us with access to an even more extensive variety of merchandise from a greater number of vendors at competitive prices.* We believe our vendors view us as an important retail partner

given our growth and market position. Our vendors utilize a network of domestic and overseas factories, providing them access to significant capacity. We source our inventory primarily from domestic vendors.

Each of our vendors is required to adhere to our vendor standards, which are designed to ensure that our vendors conduct their business in a legal, ethical and responsible manner. This also includes the requirement that all of our vendors comply with the applicable laws and regulations of the United States, those of the respective country of manufacture or exportation and all state and local laws and regulations.

121.    The Jan. 2012 Offering Documents and the Apr. 2012 Offering Documents also

provided some additional information as to the Company's relationship with Stony and KJK.

The Apr. 2012 Offering Documents stated the following in pertinent part:

***Stony Trading Relationship***
Stony Leather, Inc. ("Stony") is one of our inventory vendors. We purchase inventory from Stony on a purchase order basis. Stony sources, wholesales and distributes jewelry, accessories, handbags and gift items. Stony's customers include retailers, wholesalers, individuals, television shopping networks, and internet-based merchants. ***We are only one of Stony's several customers.*** Stony is based in Houston, Texas with a showroom in New York City, New York. Stony does not own or operate conventional brick and mortar retail outlets.

Chong Yi and Insuk Koo (two of the four Founders) own and operate Stony. Mr. Yi and Ms. Koo are brother and sister. Mr. Yi and Ms. Koo along with their sister Ms. Kyong Gill (our Executive Vice Chairperson and one of the four Founders) are stockholders of Francesca's. ***We treat Stony as an independent third-party vendor.***

Since the founding of our company, Stony has been a supplier of a variety of our inventory items. Stony has accounted for 7%, 10% and 12% of our total inventory purchases on an annual basis in fiscal years 2011, 2010 and 2009, respectively. ***We negotiate and set the rates for the merchandise and services provided to us by Stony at market rates for such merchandise and services at the time each such transaction is entered into. We often request and receive from Stony merchandise on special order or modify previously ordered merchandise. Generally, Stony provides us a 3% damage allowance to cover the costs of damaged merchandise.*** The Stony inventory purchases during fiscal years 2011, 2010 and 2009 were approximately $5.0 million, $5.0 million and $3.1 million, respectively.

***KJK Trading Relationship***

KJK Trading Corporation ("KJK Trading") is one of our inventory vendors. We purchase inventory from KJK Trading on a purchase order basis. *Although KJK Trading assists us in the design of several items of apparel we sell in our boutiques, KJK Trading does not act as our broker or agent in the sourcing of our merchandise.* Beginning in May 2010, we subleased approximately 2,000 square feet of office space to KJK Trading within our headquarters in Houston, Texas. *We did not receive any rent payments from KJK Trading in fiscal year 2010. Beginning in January 2011, the rent payment became $1,000 per month. KJK Trading employs several employees to conduct its business. We are the sole customer of KJK Trading. We treat KJK Trading as an independent third-party vendor.*

KJK Trading is owned and operated by Ki Juing Gu. Mr. Gu is the brother-in-law of Ms. Insuk Koo (one of our Founders).

KJK Trading has been one of our inventory vendors since 2008. KJK Trading has accounted for 12%, 13% and 11% of our total inventory purchases on an annual basis in fiscal year 2011, fiscal year 2010 and fiscal year 2009, respectively. We negotiate and set the rates for the merchandise and services provided to us by KJK Trading at market rates for such merchandise and services at the time each such transaction is entered into. *We often request and receive from KJK Trading merchandise on special order or modify previously ordered merchandise. Generally, KJK Trading provides us a 1% damage allowance to cover the costs of damaged merchandise*. The KJK Trading inventory purchases during fiscal years 2011, 2010 and 2009 were approximately $8.1 million, $6.6 million and $2.8 million, respectively.

122.    On April 21, 2012, the highly reputable financial newspaper *Barron's* published a feature article entitled "No Margin for Error."  The article noted FRAN's market-leading profit margins among specialty retailers, yet questioned whether the Company was getting "sweet deals from insiders who are also suppliers."  Specifically, the article stated the Company's outsized profit margins were unusual in the industry.  Typically, specialty retailers have gross margins of 42% to 44% and operating margins of roughly 10%; FRAN's margins were much higher at 52% and 21%, respectively.

123.    According to the *Barron's* article, FRAN noted in SEC filings that the Company purchases a wide assortment of merchandise in relatively small batches and with short lead times, allowing it to react quickly to fashion trends, which reduces the need for markdowns (and

thus helps margins).  Also, FRAN's high operating margins are purportedly aided by the fact that it spends very little on advertising, relying on word of mouth and the internet to get its message out.  However, *Barron's* speculated that the true source of the Company's hefty profit margins could be the result of the fact that two of FRAN's key suppliers are run by co-founders of the Company.

124.    On June 8, 2012, FRAN reported financial results for the quarterly period ended April 28, 2012.   Defendants reported that "net sales increased 48.6% to $61.3 million from $41.3 million in the same prior year period."   Gross margin increased to 53.1% compared to 52.4%.  Comparable boutique sales also increased by 15.5% following an increase of 14.7%.

125.    Defendant De Meritt stated the following in the June 7, 2012 press release regarding the 1Q 2012 financial results:

> "Our fiscal year 2012 is off to a strong start as we continue to execute on our differentiated business model. ***We attribute our continued success to our highly effective broad and shallow merchandising strategy that enables a nimble response to changes in customer demand. We are also very pleased with our new boutique performance which proves to be highly successful***. Looking ahead, we plan to continue our strong growth by consistently offering our customers great merchandise at an outstanding value, growing our boutique base and investing in the infrastructure needed to support our growth plans."

126.    The Company's 1Q 2012 Form 10-Q was signed by Defendants Thomassee and De Meritt, and included certifications signed by Defendants De Meritt and Thomassee pursuant to the Sarbanes-Oxley Act of 2002 ("SOX").

127.    On September 4, 2012, FRAN reported fiscal 2012 second quarter results and increased guidance for the full year 2012.   The Company stated that second quarter results exceeded previously provided guidance on the strength of a 20.7% increase in comparable boutique sales, its thirteenth consecutive quarterly comparable boutique sales increase.   The

Company attributed the positive results to strong customer responses across all merchandise categories, most notable in jewelry, which led to better than planned sales and product margin.

128.    On September 4, 2012, FRAN also announced that the Company's CEO and co-founder, John De Meritt was going to retire on December 31, 2012 to pursue "personal endeavors."  Jefferies investment analyst, Randal Konik, wrote in a note to clients that the "***the unexpected announcement of CEO and co-founder John de Meritt retiring from the company and the board gives us pause, especially on the heels of the recent CFO departure***."

129.    FRAN's September 4, 2012 press release provided in pertinent part as follows:

The Company's second quarter results exceeded previously provided guidance on the strength of a 20.7% increase in comparable boutique sales; its thirteenth consecutive quarterly comparable boutique sales increase. Strong customer responses across all merchandise categories, most notable in jewelry, contributed to better than planned sales and product margin.

• Net sales increased $25.1 million, or 49.1%, compared with the same period in fiscal 2011. Comparable boutique sales increased 20.7% following an increase of 5.4% in the same prior year period.
• Gross profit as a percentage of net sales increased 205 basis points compared with last year's second quarter. The increase is primarily the result of leveraging occupancy costs.
• Selling, general and administrative expenses as a percentage of net sales decreased 69 basis points compared with last year's second quarter.
• Income from operations increased 65.7% to $20.9 million compared to $12.6 million in the same prior year period. As a percentage of net sales, income from operations increased 274 basis points to 27.35% driven by gross margin expansion as well as leverage in selling, general and administrative expenses.
• Net earnings for the second quarter was $12.7 million or $0.28 per diluted share compared to net earnings for the second quarter of 2011 of $5.5 million, or $0.13 per diluted share. Adjusted net earnings for the second quarter of fiscal 2011 was $6.5 million, or $0.15 per diluted share excluding a $1.6 million pretax ($1.0 million after tax) or $0.02 per diluted share charge for the early extinguishment of debt under the Company's prior secured credit facility.
• At the end of the second fiscal quarter of 2012, the Company operated 357 boutiques in 44 states compared to 279 boutiques in 41 states at the end of the same prior year period and 283 boutiques at the end of fiscal year 2011.
• Inventory per boutique was up 11.5% while overall sales productivity per boutique increased by 16.5% in the second quarter.

• Debt decreased $7.0 million in the second quarter to $5.0 million as the Company used a portion of its cash flow to reduce its borrowing under its revolving credit facility. Subsequent to the end of the second quarter, borrowing was reduced an additional $3.0 million to $2.0 million.

130.    Also on September 4, 2012, FRAN filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended July 28, 2012.  The Company's Form 10-Q was signed by Defendants Thomassee and De Meritt, and included certifications signed by Defendants De Meritt and Thomassee pursuant to the Sarbanes-Oxley Act of 2002 ("SOX").  The Form 10-Q reiterated the Company's financial results detailed above.

131.    On December 5, 2012, FRAN announced third quarter results and once again boosted full year EPS guidance.  Now the Company was expecting $1.00 to $1.01 per share. Third quarter results were driven by a 16.7% increase in comparable boutique sales over the year prior.

132.    FRAN's December 5, 2012 press release provided in pertinent part as follows:

**<u>Third Quarter Summary</u>**

Net sales increased 44% to $72.0 million driven by a 16.7% increase in comparable boutique sales over a prior year period 6.5% increase and 76 new boutique openings since the end of the third quarter last year. The comparable sales increase was driven by increased transactions while average sale per transaction remained constant with prior year levels.

Gross profit for the quarter increased by 47% to $37.9 million. The gross profit rate improved 96 basis points to 52.61%. The increase in gross profit rate was the result of leveraging boutique occupancy costs.

Adjusted(1) selling, general and administrative expenses for the quarter increased by 27% to $19.8 million. Total adjusted(1) SG&A, as a percentage of net sales, decreased by 355 basis points to 27.51%. The decrease in rate is primarily due to leverage of costs as sales growth significantly outpaced expense growth.

Adjusted(1) income from operations for the quarter increased by 76% to $18.1 million, with an adjusted(1) operating profit margin of 25.10%.

For the year to date period, net sales increased 47% to $209.7 million driven by a 17.7% increase in comparable boutique sales. Adjusted earnings per diluted share was $0.73 after excluding charges related to the relocation of our headquarters and distribution facilities, secondary equity offering and option acceleration costs, these adjustments are set forth below in detail.

Total inventories at the end of the quarter increased by $7.0 million to $23.5 million, a 42% increase versus the prior comparable quarter. Inventory per boutique increased 12%.

The Company completed the relocation of its headquarters and distribution facility with no disruption to business.

John De Meritt, CEO, commented, "We delivered **another quarter of strong results, demonstrating the appeal of our business model of a differentiated merchandise strategy in a boutique environment**. Our scalable, high margin merchandising model combined with productive new boutique economics provides a runway for boutique growth and gives us confidence in francesca's® long-term growth potential."

Neill Davis, President, added, "**We continued to see strong sales growth** during the third quarter, with comparable boutique sales growth of 16.7%, exceeding previous guidance and on top of the prior year 6.5% increase. Our performance reflects ongoing momentum as customers continue to respond favorably to francesca's® broad and shallow merchandise assortment and unique shopping experience. We are pleased with the momentum that we have built behind the business and the prospects that lay ahead as we continue to execute on our key operating initiatives.

133.    That same day, J.P. Morgan issued a research report on the Company with a "Neutral" rating.  The J.P. Morgan analyst noted that FRAN had 12 million shares sold short as of November 15, 2012, and noted that some investors were convinced that potential red flags created by related party transactions and management turnover were too hard to ignore.

134.    On December 7, 2012, FRAN filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended October 27, 2012.  The Company's Form 10-Q was signed by Defendants Thomassee and De Meritt, and included certifications signed by Defendants De Meritt and Thomassee pursuant to the Sarbanes-Oxley Act of 2002 ("SOX").  The Form 10-Q reiterated the Company's financial results detailed in the December 5, 2012 press release.

135.    On January 14, 2013, FRAN announced that it had raised its guidance for the fourth quarter ending February 2, 2013 based on its holiday period sales and margin performance.  The press release stated the following in relevant part:

> The Company now expects sales to be between $84.5 million and $85.0 million, representing an increase of 37% to 38% over the prior year quarter. This outlook is based on an estimated 7% to 8% comparable boutique sales increase over the prior year quarter, following a 14.7% increase in the same period last year. Net income for the quarter is expected to be in the range of $13.0 million to $ 13.5 million or $0.29 to $0.30 per diluted share, representing an increase of 45% to 50% over the fourth quarter of the prior year's adjusted $0.20 per diluted share, which excluded $0.4M after tax secondary equity offering costs, or $0.01 per diluted share.

> Neill Davis, chief executive officer, commented, "*We are pleased with our holiday selling season. Our increased fourth quarter guidance reflects positive customer response to francesca's® broad and shallow merchandising strategy and small format, differentiated boutique experience. We are well positioned to deliver our growth objectives as we continue to execute our merchandising model, expand our boutique base, and further develop our e-commerce strategy*."

136.    On March 19, 2013, FRAN reported fourth quarter and full year fiscal 2012 financial results.   The Company reported that fourth quarter earnings per share jumped 78 percent to 33 cents.  For the full year, FRAN was predicting earnings of $1.27 to $1.30 per share on $365 million to $370 million in revenue.  In reaction to the positive results, FRAN's share price jumped $1.93 per share, or over 7%, to $28.91 per share on March 20, 2013.

137.    The press release stated the following in pertinent part:

> Francesca's Holdings Corporation (NASDAQ: FRAN) today reported a 73.7% increase in earnings per diluted share of $0.33 for the fourth quarter ended February 2, 2013 compared to $0.19 per diluted share for the same quarter last year. Net sales in the fourth quarter were $86.7 million, an increase of 40.6% compared with net sales of $61.7 million during the same period in fiscal 2011. Net earnings of $14.9 million increased 78.0% compared to net earnings of $8.4 million for the same quarter last year.

> Neill Davis, Chief Executive Officer, commented, "*We delivered another quarter of strong growth and profitability as the company's differentiated shopping*

*experience continues to resonate with new and existing customers. We are well positioned with the teams and capabilities to continue expansion of our boutique base, increase boutique productivity and further develop our direct-to-customer presence. Looking ahead, we continue our growth trajectory with 80 openings for fiscal 2013, reaching the milestone of over 400 locations by the end of the first quarter*."

Francesca's follows the NRF reporting calendar, which included an extra week in the fourth quarter of fiscal 2012 (the 53rd week). In the 53rd week, the Company had net sales of approximately $3.9 million, representing an approximate $0.03 increase to earnings per diluted share for both the quarter and fiscal year. The 53rd week is not included in comparable boutique sales calculations.

138.    Also on March 19, 2013, Defendants Sonenshein, Davis, Vendetti and Backes provided additional positive commentary concerning the Company's financial and business metrics during the Company's earnings call.

139.    On March 22, 2013, the Company filed with the SEC its annual report on Form 10-K for the fiscal year ended February 2, 2013.  The Company's Fiscal Year 2012 Form 10-K was signed by Defendants Davis, Vendetti, Brenneman, Bender, Emmett, Toulantis, Zannino and Kunes, and reiterated the Company's financial results announced on March 19, 2013.

140.    In regards to the Company's sourcing strategy, the Fiscal Year 2012 Form 10-K stated the following:

Our ability to quickly make decisions on trend-right items combined with the short production lead times of our vendors maximizes our speed to market. We use vendors based in the United States that source from both domestic and overseas markets and it generally takes four to twelve weeks from the time an order is placed to the time merchandise is available on the boutique floor. With these short lead times, we are able to make more informed buying decisions in terms of customers' merchandise expectations, and to quickly react to changing fashion trends. This also supports our merchandise strategy of offering a broad but limited assortment that is infused with new items five days a week. Due to the limited quantity of our buys in any one style, we avoid material inventory positions in individual style which enhances our ability to quickly deliver trend-right merchandise and minimizes the risk of fashion misses, which can lead to increased inventory markdowns and diminished gross margins.

We do not own or operate any manufacturing facilities. We have relationships with a diverse base of over 400 vendors and transact business on a purchase order-by-purchase order basis. In fiscal year 2012, we sourced approximately 95% of our merchandise from 200 vendors while our top 10 vendors sourced approximately 46% of our merchandise, with no single vendor accounting for more than 13% of our purchases. We believe that the loss of any of our current vendors will not result in a material disruption to our business. Stony Leather, Inc. ("Stony") and KJK Trading Corporation ("KJK") were two of our largest vendors in fiscal years 2012 and 2011. KJK and Stony are owned and operated by certain family members of Ms. Kyong Gill, our former Executive Vice Chairperson and former member of our Board of Directors (the "Board"). Ms. Gill retired from the company and the Board on July 10, 2012 and at such time Stony and KJK ceased to be a related party. For information regarding our relationship with Stony and KJK, see "Management's Discussion and Analysis of Financial Condition and Results of Operations-Related Party Transactions."

We do not enter into exclusive contracts with our vendors and we continue to expand our vendor network. This provides us with access to an even more extensive variety of merchandise from a greater number of vendors at competitive prices. We believe our vendors view us as an important customer given our growth and market position. Our vendors utilize a network of domestic and overseas factories, providing them access to significant capacity. We source our inventory primarily from domestic vendors.

Each of our vendors is required to adhere to our vendor standards, which are designed to ensure that our vendors conduct their business in a legal, ethical and responsible manner. This also includes the requirement that all of our vendors comply with the applicable laws and regulations of the United States, those of the respective country of manufacture or exportation and all state and local laws and regulations.

141.   Only a week later, on March 26, 2013, FRAN announced its third secondary offering since its IPO at a price of $28.65 per share—with the underwriter agreeing to purchase shares at $28.36 per share.  All of the 7,394,727 shares in this offering were being sold by selling stockholders, including some of the Company's management, and certain CCMP affiliates.  As a result of the sale, CCMP would no longer own any of the Company's stock once the secondary offering closed.

142.   On March 26, 2013, FRAN filed its prospectus with the SEC in connection with the Mar. 2013 SPO.  Also on March 26, 2013, the Company filed its Registration Statement.  On

March 28, 2013, the Company filed its completed Prospectus Supplement to the Prospectus dated March 26, 2013 pursuant to Rule 424(b)(7).

143.    In the Offering Documents, FRAN touted its ability for growth.  In particular, the Mar. 2013 SPO Offering Documents stating the following:

> By offering a differentiated shopping experience and high-quality merchandise at *a compelling value*, our boutiques have been ***successful across a wide variety of geographic markets and shopping venues***. We believe we have an opportunity to ***continue to grow*** our boutique base from 360 locations in 44 states as of February 2, 2013 to approximately 900 boutiques in the United States over the next eight years based on our flexible boutique format, ***the financial characteristics of our boutiques*** and our ongoing analysis of shopping venues that meet our criteria for new boutiques. Our merchandise is also available through our website, *www.francescas.com*.

144.    The Mar. 2013 Offering Documents included the following financial data:

| | Fiscal Year Ended | | |
| --- | --- | --- | --- |
| | February 2, 2013 | January 28, 2012 | January 29, 2011 |
| | (in thousands, except share and per share amounts) | | |
| Net sales[1] | $ 296,373 | $ 204,158 | $ 135,176 |
| Cost of goods sold and occupancy costs[2] | 137,873 | 97,365 | 65,008 |
| Gross profit | 158,500 | 106,793 | 70,168 |
| Selling, general and administrative expenses | 80,560 | 63,262 | 40,525 |
| Income from operations | 77,940 | 43,531 | 29,643 |
| Interest income (expense) | (672) | (4,868) | (1,633) |
| Loss on early extinguishment of debt | — | (1,591) | — |
| Other income (expense) | 230 | 284 | (2) |
| Income before income tax expense | 77,498 | 37,356 | 28,008 |
| Income tax expense | 30,437 | 14,855 | 11,113 |
| Net income | $ 47,061 | $ 22,501 | $ 16,895 |
| Basic earnings per common share[3] | $ 1.08 | $ 0.53 | $ 0.43 |
| Diluted earnings per common share[3] | $ 1.05 | $ 0.52 | $ 0.41 |
| Dividends declared per common share | — | — | $ 2.39 |
| **Weighted average shares outstanding** | | | |
| Basic shares | 43,744 | 42,087 | 39,385 |
| Diluted shares | 44,807 | 42,948 | 40,907 |

| | As of Fiscal Year Ended | | |
| --- | --- | --- | --- |
| | February 2, 2013 | January 28, 2012 | January 29, 2011 |
| | (in thousands, except percentages) | | |
| **Consolidated Balance Sheet Data:** | | | |

| | | | | | |
|---|---|---|---|---|---|
| Total current assets | $ | 59,106 | $ | 36,041 | $ | 31,721 |
| Total assets | | 112,595 | | 72,312 | | 59,124 |
| Long-term debt | | — | | 22,000 | | 87,875 |
| Total liabilities | | 40,538 | | 55,410 | | 114,592 |
| Convertible redeemable preferred stock – series A | | — | | — | | — |
| Total stockholders' equity (deficit) | | 72,057 | | 16,902 | | (55,468) |
| **Operating Data:** | | | | | | |
| Comparable boutique sales growth for period[4] | | 14.9% | | 10.4% | | 15.2% |
| Number of boutiques open at end of period (not in thousands) | | 360 | | 283 | | 207 |
| Net sales per average square foot for period (not in thousands)[5] | $ | 632 | $ | 554 | $ | 508 |
| Average square feet (not in thousands)[6] | | 1,385 | | 1,409 | | 1,428 |
| Total gross square feet at end of period | | 499 | | 399 | | 296 |

145.     With respect to the Company's relationship with CCMP, the Offering Documents detailed the conflicts of interest with CCMP. In particular, the Mar. 2013 Offering Documents stated the following:

> While CCMP will no longer own shares of our common stock after the completion of this offering, representatives of CCMP and its affiliates will continue to occupy two seats on our board of directors. CCMP is in the business of making investments in companies and may from time to time acquire and hold interests in businesses that compete directly or indirectly with us. In addition, corporate opportunities may arise in the area of potential acquisitions of competitive businesses that may be attractive to us as well as to CCMP or its affiliates.

> CCMP and the members of our board of directors who are affiliated with CCMP, by the terms of our amended and restated certificate of incorporation, are not required to offer us any transaction opportunity of which they become aware and could take any such opportunity for themselves or offer it to other companies in which they have an investment, unless such opportunity is expressly offered to them solely in their capacity as our directors. The company, by the terms of our amended and restated certificate of incorporation, expressly renounces any interest in any such corporate opportunity to the extent permitted under applicable law, even if the opportunity is one that we would reasonably be deemed to have pursued if given the opportunity to do so. Our amended and restated certificate of incorporation cannot be amended to eliminate the company's renunciation of any such corporate opportunity arising prior to the date of any such amendment. CCMP or its affiliates may also acquire competing businesses that may not be attractive to us, and have no obligation to refrain from acquiring competing businesses. Any competition could intensify if an affiliate or subsidiary of CCMP were to enter into or acquire a business similar to our specialty retail operations.

CCMP or its affiliates may enter into or acquire a competing business in the future.

Anti-takeover provisions in our charter documents and provisions of Delaware law might discourage, delay or prevent change in control of our company and may result in an entrenchment of management and diminish the value of our common stock.

146.    The same week as the Mar. 2013 SPO, a March 27, 2013 article by *Barron's* entitled "Time to Say Ciao to Francesca's", expressed skepticism in "Francesca's ability to outperform, given its rapid expansion and cozy relationship with suppliers" and the difficulty "Francesca's may have in maintaining its sky-high margins."

147.    On June 5, 2013, in its first earnings release after CCMP completely exited its position in the Company, FRAN reported first quarter fiscal 2013 results that disappointed investors.  The Company reported first quarter revenue of $79 million (versus estimate of $79.5 to $80.5 million), and comparable store sales which were only up 2% versus a forecast of up 4% to 5%.  FRAN also reported a gross margin rate of 52.4% versus an estimate of 53.1%.  Despite the disappointing results, FRAN still reaffirmed its full year EPS estimate for earnings of $1.27-$1.30 per share on revenues of $365 to $370 million.  FRAN emphasized that "[n]et sales increased 29%" and "[a]djusted diluted earnings per share increased 24% to $0.26."  The Company's stock price dropped $2.72 per share, or 9%, from $30.09 per share to $27.27 per share on June 6, 2013.

148.    In the press release, Defendant Davis stated the following, in pertinent part:

> *We delivered on our earnings expectations as well as several strategic goals in the first quarter*. We opened 56 new boutiques increasing our market presence to 416 boutiques, *achieved record direct-to-consumer sales* now representing 2.1% of total Company sales for the quarter, and successfully completed the rollout of our new point-of-sale system in our boutiques. *Our continued execution on key growth initiatives combined with our differentiated business model and unique brand experience position us well for long term growth*.

149.    Also on June 5, 2013, the Company held a first quarter 2013 earnings conference call.  Defendants Sonenshein, Davis and Vendetti provided positive commentary concerning the Company's financial and operating metrics.

150.    On June 7, 2013, the Company filed with the SEC its quarterly report on Form 10-Q for the quarter ended May 4, 2013.  The Company's Fiscal Year 2012 Form 10-K was signed and certified by Defendants Vendetti and Davis and reiterated the Company's financial results announced on June 5, 2013.

151.    On August 28, 2013, a *Seeking Alpha* article entitled "Francesca's: Investors In For Nasty Surprise Next Week" scrutinized FRAN's ability to "maintain huge margins and spectacular growth," and stated the following: [12]

> Underlying various short theories is the fact that Francesca's largest suppliers have been owned by family members of the founding management of Francesca's. These suppliers have supplied roughly 20-25% of total inventory. *But Francesca's has declined to disclose the purchase terms or margins of the products that it gets from these sources.* It has disclosed that its suppliers are responsible for the ability to generate Francesca's ultra fast turnaround time of just 4-6 weeks.
>
> The suppliers involved are KJK Trading and Stony Leather. In total, around 20-25% of Francesca's purchases had come from these two suppliers. *With KJK, it is clear that the company does not even have a single other customer aside from Francesca's.*
>
> *The supplier only does business with Francesca's and no one else. KJK even operates out of the same building as Francesca's in Houston. Prior to the IPO, KJK did not even pay rent to Francesca's for the space. Following the IPO, a token rent of $1,000 was set. If we look further, we can see that Francesca's discloses that it does not even maintain supply contracts with these suppliers.*
>
> KJK has been owned and run by Ki Juing Gu. Mr. Gu is the brother-in-law of Ms. Insuk Koo, a founder of Francesca's as well as Kyong Gill, founder and former

---

[12] Richard Pearson, *Francesca's: Investors In For Nasty Surprise Next Week*, Seeking Alpha, (Aug. 28, 2013) *available at* http://seekingalpha.com/article/1661052-francescas-investors-in-for-nasty-surprise-next-week?source=yahoo

EVC of Francesca's. Mr. Gu also owns KKGM, which also supplies to Francesca's. Like KJK, KKGM does not have any other customers other than Francesca's. **It is basically a captive supplier.**

**So then KJK is owned by a relative. It does no business with anyone other than Francesca's and it even operates out of the same building as Francesca's. The parties see no need to maintain supply contracts.**

Based on these facts, it feels very much like a de facto subsidiary.

Likewise, with Stony Leather, the company discloses that:

Chong Yi and Insuk Koo (two of the four Founders) own and operate Stony. Mr. Yi and Ms. Koo are brother and sister. Mr. Yi and Ms. Koo along with their sister Ms. Kyong Gill (our Executive Vice Chairperson and one of the four Founders) are stockholders of Francesca's. Our relationship with Stony is that of an independent third-party vendor.

*(NOTE TO READERS: Gu and Koo are two different English ways of spelling the same exact name in Korean. These different spellings refer to the same last name which belongs to these members of the same family.)*

\* \* \*

Clearly a publicly listed company such as Francesca's would never under-declare the value of imported goods to customs. They would simply have too much to lose and the consequences would be permanent.

**But if its "separate" supplier were found to have under reported, there would be no consequences to Francesca's. The supplier would simply shut down and then reopen using a different name, continuing to supply to Francesca's. Since no one knows the ultimate location of the factories in China, there would be no way for anyone to claim that this was an identical company.**

\* \* \*

**By posting spectacular margins for the two years since coming public, founders of Francesca's caused the stock to trade at a premium price. Now that several years have passed as a public company, the founders are left owning little to no stock and have resigned from their positions at the company.**

**Now that they are gone, margins have been coming steadily down and are approaching those of other competitors in the business.**

47

C.      **The Truth Comes To Light**

152.    The Company's aforementioned statements are false and misleading because the Defendants misrepresented and failed to disclose adverse facts, which were known to Defendants or recklessly disregarded by them, including that: (i) FRAN's disclosures regarding its margins, same store sales and related positive earnings were false and misleading and unsustainable; (ii) specifically, regarding the Company's same-store sales growth, the Company failed to acknowledge the impact weather and a competitive retail environment had, instead relying on new store openings to increase sales; (iii) the Company's relationship with certain vendors would be negatively impacted and result in lower margins upon CCMP's exit; (iv) FRAN dramatically increased promotional activity to meet financial targets, causing FRAN to lose its competitive profit margin edge which partially supported the Company's high stock price; (v) FRAN concealed the Company's sales terms and margins with its largest suppliers, owned by family members of FRAN's founding management, which could prevent FRAN's ability to maintain above-average profit margins, and (vi) as a result, the Company's financial statements were deficient and misleading at all relevant times.

153.    On September 4, 2013, prior to the opening of the financial markets, FRAN announced fiscal second quarter results.  The Company slashed full year guidance to $1.10-$1.16 per share from the previous reaffirmed guidance of $1.27-$1.30 per share.  The Company was now predicting full year sales of $343-$349.5 million from the previous reaffirmed guidance of $365-$370 million.   FRAN also reported a comparable ***same store decline of 1% versus guidance of a positive 1-2%, and was dramatically lower than the 21% increase in the previous year***.  J.P. Morgan noted that the Company's downward revision "***shocked the shares as investors looked for cracks in the peak margin story***."  In its earnings release, FRAN noted that

total inventories increased 32% over the prior year quarter as a result of reduced sales trends in the later part of the quarter, and the Company has plans to reduce inventory purchases and to offer incremental clearance activities to better align inventory to future sales.

154.    Specifically, FRAN's September 4, 2013 press release stated the following:

Francesca's Holdings Corporation (Nasdaq:FRAN) today reported net income of $14.6 million or $0.33 per diluted share for the second quarter of 2013, compared to net income for the second quarter of 2012 of $12.7 million, or $0.28 per diluted share. The Company also announced the board of directors authorized a $100 million share repurchase program.

Neill P. Davis, francesca's Chief Executive Officer stated, "While we posted high teens increases in second quarter and year to date sales and earnings, our second quarter sales *performance was softer than we anticipated*. We were able to maintain strong profitability with operating income margins only modestly below the prior year levels. Our performance in the quarter reflects the anniversary of very strong rates of growth in the prior year; lower levels of customer traffic most evident in the later part of the second quarter and the lack of a dominant apparel fashion trend."

Mr. Davis continued, "Going into the third quarter we are challenged with strong prior year growth rates and although we have experienced improvements in traffic trends during the final week of August, no clear direction has emerged. While we are taking action to drive our performance, we anticipate that traffic trends will remain challenging. Accordingly, we are reducing our outlook for 2013. Several initiatives are underway that we believe will benefit our long term financial performance. These initiatives include leveraging the DTC channel to build on the affection our already loyal customer has for our brand, strengthening visual presentations in boutiques to make fashion trends easier to shop, and additional infrastructure improvements. Overall, we are highly confident in our differentiated, fast growing, and highly profitable business model and we are steadfast in our efforts to deliver on our long-term growth objectives."

155.    In reaction to the disclosures of an earnings miss, deteriorating margins and lowered full-year guidance, FRAN's share price plummeted $6.23 per share, or 26%, from $24.02 per share on September 3, 2013 to $17.79 per share on September 4, 2013, wiping out $275 million in the Company's market capitalization in one day.  FRAN securities traded as high as $31.66 per share during the Class Period, on September 24, 2012.  The $17.79 per share

closing price was $10.86 per share, or 38%, lower than the secondary price of $28.65 per share that allowed certain members of management to sell FRAN shares and CCMP to completely exit its position in the Company.

156.     As a result of Defendants' wrongful course of conduct, FRAN shareholders have lost millions of dollars in their investment in the Company.  Defendants created a materially false and misleading perception in the market regarding FRAN's purportedly strong financial and operational condition, as well as the Company's promising future prospects.

## VII.     THE EXCHANGE ACT DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL INFORMATION

157.     The statements described above and in Defendants' class period filings with the SEC were each materially false and misleading when made.  Throughout the Class Period, Defendants failed to disclose (i) FRAN's disclosures regarding its margins, same store sales and related positive earnings were false and misleading and unsustainable; (ii) specifically, regarding the Company's same-store sales growth, the Company failed to acknowledge the impact weather and a competitive retail environment had, instead relying on new store openings to increase sales; (iii) the Company's relationship with certain vendors would be negatively impacted and result in lower margins upon CCMP's exit; (iv) FRAN dramatically increased promotional activity to meet financial targets, causing FRAN to lose its competitive profit margin edge which had partially supported the Company's high stock price; and (v) FRAN concealed the Company's sales terms and margins with its largest suppliers, including Stony and KJK, companies owned by family members of FRAN's founding management, which could prevent FRAN's ability to maintain above-average profit margins.

158.     As a result, FRAN's reported financial results were materially false and misleading.

## VIII.   UNDISCLOSED ADVERSE INFORMATION

159.   The market for FRAN's securities was an open, well-developed and efficient market at all relevant times.  As a result of the materially false and misleading statements and failures to disclose described herein, FRAN's securities traded at artificially inflated prices during the Class Period.  Plaintiffs and the other members of the Class purchased or otherwise acquired FRAN's securities relying upon the integrity of the market price of FRAN's securities and market information related to FRAN, and have been damaged thereby.

160.   During the Class Period, Defendants materially misled the investing public, thereby inflating the price of FRAN's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Such statements and omissions were materially false and misleading in that they failed to disclose material adverse non-public information and misrepresented the truth about the Company, its business and operations, as alleged herein.

161.   At all relevant times, the material misrepresentations and omissions particularized herein directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and the other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and misleading statements about FRAN's business, prospects and operations.

162.   These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of FRAN and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' false and misleading statements during the Class Period resulted in

Plaintiffs and the other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## IX.    SCIENTER ALLEGATIONS

163.    As alleged herein, the Exchange Act Defendants acted with scienter in that the Exchange Act Defendants knew that the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

164.    As set forth herein, the Exchange Act Defendants, by virtue of their receipt of information reflecting the true facts regarding FRAN, their control over, receipt and/or modification of FRAN's allegedly materially misleading statements and omissions, and/or their positions with the Company which made them privy to confidential information concerning FRAN, participated in the fraudulent scheme alleged herein.

165.    The ongoing fraudulent scheme described herein could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

## X.    STATUTORY SAFE HARBOR

166.    The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  Furthermore, many of the statements pleaded herein were not identified as "forward-looking statements" when made, or indicated that actual results "could differ materially from

those projected."  Nor were there any meaningful cautionary statements identifying important factors that could cause actual results to differ materially from the statements made therein.

167.    Defendants are liable for the forward-looking statements pleaded because, at the time each of those forward-looking statements was made, Defendants knew the forward-looking statement was false, and that the forward-looking statement was authorized and/or approved by an executive officer of FRAN who knew that such statement was false when made.

## XI.    **LOSS CAUSATION**

168.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of FRAN's securities and operated as a fraud or deceit on Class Period purchasers of FRAN's securities by failing to disclose to investors that the Company's financial results were materially misleading and misrepresented material information.  When Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the prices of FRAN's securities fell precipitously as the prior inflation came out of the Company's stock price.  As a result of their purchases of FRAN's securities during the Class Period, Plaintiffs and the other Class members suffered economic loss.

169.    By failing to disclose the true state of the Company's business prospects and growth strategy, investors were not aware of the true state of the Company's financial status.  Therefore, Defendants presented a misleading picture of FRAN's business and prospects.  Thus, instead of truthfully disclosing during the Class Period the true state of the Company's business, Defendants caused FRAN to conceal the truth.

170.    Defendants' false and misleading statements had the intended effect and caused FRAN's common stock to trade at artificially inflated levels throughout the Class Period.

However, as a direct result of the Company's problems coming to light, FRAN's common stock price fell approximately 26% percent immediately following the announcement of the Company's true financial state.  This drop removed the inflation from the price of FRAN's securities, causing real economic loss to investors who purchased the Company's securities during the Class Period.

171.   The decline in the price of FRAN's common stock after the truth came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to to public investors and the market.  The timing and magnitude of FRAN's common stock price decline negates any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct.  The economic loss suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of FRAN's securities and the subsequent decline in the value of FRAN's securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## XII.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

172.   At all relevant times, the market for FRAN stock was an efficient market for the following reasons, among others:

a.   FRAN  securities met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient market;

b.   As a regulated issuer, FRAN filed periodic public reports with the SEC and NASDAQ;

c.      FRAN securities were followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace; and

d.      FRAN regularly issued press releases which were carried by national newswires.  Each of these releases was publicly available and entered the public marketplace.

173.    As a result, the market for FRAN securities promptly digested current information with respect to the Company from all publicly-available sources, and reflected such information in FRAN's stock price.  Under these circumstances, all purchasers of FRAN securities during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices and a presumption of reliance applies.

## XIII.   CLASS ACTION ALLEGATIONS

174.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons who purchased or otherwise acquired FRAN securities during the Class Period, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of FRAN and the directors, officers and employees of the Company or its subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

175.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are

thousands of members of the Class located throughout the United States.  Throughout the Class Period, FRAN securities were actively traded on the NASDAQ (an open and efficient market) under the symbol "FRAN".  As of August 3, 2013, the Company had approximately 44.1 million shares outstanding.  Record owners and the other members of the Class may be identified from records maintained by FRAN and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

176.    Plaintiffs' claims are typical of the claims of the other members of the Class, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

177.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

178.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.      whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b.      whether Defendants participated in and pursued the common course of conduct complained of herein;

c.      whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period, including the Offering Documents, misrepresented material facts about the business, finances, financial condition and prospects of FRAN;

d.      whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, value, performance and prospects of FRAN;

e.      whether the market price of FRAN common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f.      the extent to which the members of the Class have sustained damages and the proper measure of damages.

179.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since the joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this suit as a class action.

## XIV.   COUNTS AGAINST DEFENDANTS UNDER THE EXCHANGE ACT

### COUNT IV
### For Violations Of §10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder Against the Exchange Act Defendants

180.    Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.  This claim is asserted against the Exchange Act Defendants.

181.    During the Class Period, FRAN and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and the other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of FRAN

common stock; and (iii) cause Plaintiffs and the other members of the Class to purchase FRAN stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, the Exchange Act Defendants, and each of them, took the actions set forth herein.

182.    These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for FRAN securities in violation of §10(b) of the Exchange Act and Rule 10b-5.  The Exchange Act Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.  The Individual Defendants are also sued herein as controlling persons of FRAN, as alleged herein.

183.    In addition to the duties of full disclosure imposed on the Exchange Act Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

184.    FRAN and the Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material

information about the business, business practices, performance, operations and future prospects of FRAN as specified herein.  These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of FRAN's value and performance and substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about FRAN and its business, operations and future prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of FRAN's securities during the Class Period.

185.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's operational and financial reports; (iii) the Individual Defendants enjoyed significant personal contact and familiarity with each other and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

186.    These Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing FRAN's operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its stock.  As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

187.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of FRAN securities was artificially inflated during the Class Period.  In ignorance of the fact that the market price of FRAN shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Exchange Act Defendants, upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by the Exchange Act Defendants but not disclosed in public statements by these Defendants during the Class Period, Plaintiffs and the other members of the Class acquired FRAN securities during the Class Period at artificially inflated high prices and were damaged thereby.

188.    At the time of said misrepresentations and omissions, Plaintiffs and the other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs

and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of FRAN, which were not disclosed by the Exchange Act Defendants, Plaintiffs and the other members of the Class would not have purchased or otherwise acquired FRAN securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

189.     By virtue of the foregoing, FRAN and the Individual Defendants each violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

190.     As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT V
### For Violations of §20(a) of the Exchange Act
### Against the Individual Defendants

191.     Plaintiffs repeat and reallege the allegations set forth above as if set forth fully herein.  This claim is asserted against the Individual Defendants.

192.     The Individual Defendants were and acted as controlling persons of FRAN within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contends are false and misleading.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press

releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

193.    In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

194.    As set forth above, FRAN and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.   By virtue of their controlling positions, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XV.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs, individually and on behalf of the Class, prays for judgment as follows:

a)    Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b)    Awarding Plaintiffs and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

c)    Awarding Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d)    Awarding such other relief as this Court deems appropriate.

## XVI.  <u>JURY DEMAND</u>

Plaintiffs demands a trial by jury.

Dated: October 29, 2013

**LAW OFFICES OF CURTIS V. TRINKO, LLP**

By: _____
Curtis V. Trinko (CT-1838)
Jennifer E. Traystman (JT-7583)
C. William Margrabe
16 West 46th Street, 7th Floor
New York, NY 10036
Tel:  (212) 490-9550
Fax:  (212) 986-0158
Email:  Ctrinko@trinko.com

*Liaison Counsel for Plaintiffs*

**SAXENA WHITE P.A.**
Joseph E. White, III
jwhite@saxenawhite.com
Lester R. Hooker
lhooker@saxenawhite.com
2424 N. Federal Highway, Suite 257
Boca Raton, FL 33431
Tel: 561 394-3399
Fax: 561 394-3382

*Counsel for Plaintiffs*

## CERTIFICATION AND AUTHORIZATION OF LEAD PLAINTIFF

I, Jonathan Frost, on behalf of the West Palm Beach Police Pension Fund ("WPB Police"), hereby certify, as to the claims asserted under the federal securities laws, that:

1.  I am authorized in my capacity as Chairman of the Board of Trustees of WPB Police to initiate litigation and to execute this Certification on behalf of WPB Police.

2.  WPB Police did not purchase the securities that are the subject of this action at the direction of counsel, or in order to participate in any action arising under the federal securities laws.

3.  WPB Police is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4.  WPB Police's transactions in Francesca's Holdings Corporation common stock are set forth in the Schedule A attached hereto.

5.  WPB Police has sought to serve and was appointed as lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

    *None*

6.  WPB Police has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff, was not appointed lead plaintiff or the lead plaintiff decision is still pending:

    *In re Questcor Securities Litigation,* Case No. 12-cv-1623-DMG (C.D. Cal.)

7.  WPB Police will not accept any payment for serving as a representative party on behalf of the Class beyond WPB Police's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.
Executed this _31 st_ day of October 2013.

West Palm Beach Police Pension Fund


Jonathan Frost, Chairman

| **SCHEDULE A** |
| :---: |
| **West Palm Beach Police Pension Fund** |
| **Transactions in Francesca's Holdings Corp.** |

**Beg. Hold.**          2,157

| **Common Stock Purchases** | | |
| :---: | :---: | :---: |
| **Date** | **Shares** | **Price** |
| *01/27/12* | *165* | *$23.00* |
| *04/18/12* | *3,334* | *$27.60* |
| 08/03/12 | 61 | $29.49 |
| 12/07/12 | 390 | $23.70 |
| 12/13/12 | 386 | $23.92 |
| 12/28/12 | 156 | $24.94 |
| 01/04/13 | 710 | $27.19 |

| **Common Stock Sales** | | |
| :---: | :---: | :---: |
| **Date** | **Shares** | **Price** |
| 05/15/12 | 826 | $24.66 |
| 05/16/12 | 826 | $22.27 |
| 05/31/13 | 389 | $28.96 |
| 08/29/13 | 779 | $23.90 |
| ***Post Class Period Sales*** | | |
| 09/04/13 | 2,795 | $18.25 |
| 09/05/13 | 529 | $18.35 |
| 09/06/13 | 25 | $18.34 |
| 09/09/13 | 726 | $18.37 |
| 09/10/13 | 464 | $18.54 |

*Italics: Indicates direct participation in secondary offering*

## CERTIFICATION AND AUTHORIZATION OF LEAD PLAINTIFF

I, Gill Enos, on behalf of the Taunton Contributory Retirement System ("Taunton"), hereby certify, as to the claims asserted under the federal securities laws, that:

1.  I am authorized in my capacity as Acting Chairperson of the Board of Trustees of Taunton to initiate litigation and to execute this Certification on behalf of Taunton.

2.  Taunton did not purchase the securities that are the subject of this action at the direction of counsel, or in order to participate in any action arising under the federal securities laws.

3.  Taunton is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4.  Taunton's transactions in Francesca's Holdings Corporation common stock are set forth in the Schedule A attached hereto.

5.  Taunton has sought to serve and was appointed as lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

    *None*

6.  Taunton has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff, was not appointed lead plaintiff or the lead plaintiff decision is still pending:

    *None*

7.  Taunton will not accept any payment for serving as a representative party on behalf of the Class beyond Taunton's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.
Executed this _31_ day of October 2013.

Taunton Contributory Retirement System

Gill Enos, Acting Chairperson

**SCHEDULE A**
**Taunton Contributory Retirement System**
**Transactions in Francesca's Holdings Corp.**

**Beg. Hold.**                              0

| Common Stock Purchases | | | | Common Stock Sales | | |
|---|---|---|---|---|---|---|
| **Date** | **Shares** | **Price** | | **Date** | **Shares** | **Price** |
| 10/16/12 | 907 | $30.17 | | *None* | | |
| 10/16/12 | 3,540 | $30.09 | | | | |
| 10/16/12 | 458 | $29.98 | | | | |
| 10/17/12 | 3,500 | $30.77 | | | | |
| 10/18/12 | 1,039 | $30.05 | | | | |
| 10/18/12 | 2,079 | $30.05 | | | | |
| 10/19/12 | 4,120 | $29.51 | | | | |
| 11/08/12 | 1,690 | $25.25 | | | | |
| 12/06/12 | 656 | $25.00 | | | | |
| 12/06/12 | 656 | $25.03 | | | | |
| 12/06/12 | 242 | $25.00 | | | | |
| 12/07/12 | 1,790 | $23.75 | | | | |
| 12/13/12 | 1,031 | $23.95 | | | | |
| 12/26/12 | 704 | $24.48 | | | | |
| 12/26/12 | 1,119 | $24.49 | | | | |
| 01/14/13 | 1,374 | $26.54 | | | | |
| 01/14/13 | 406 | $26.71 | | | | |
| 02/22/13 | 437 | $24.52 | | | | |
| 02/22/13 | 229 | $24.49 | | | | |
| 02/22/13 | 264 | $25.00 | | | | |
| 02/26/13 | 351 | $24.80 | | | | |
| 03/20/13 | 534 | $28.94 | | | | |
| 03/21/13 | 693 | $28.72 | | | | |
| 03/25/13 | 495 | $30.48 | | | | |
| 06/06/13 | 1,353 | $27.19 | | | | |
| 06/06/13 | 564 | $27.34 | | | | |
| 06/20/13 | 618 | $24.66 | | | | |
| 06/20/13 | 545 | $24.65 | | | | |
| 07/30/13 | 828 | $25.23 | | | | |
| 08/22/13 | 447 | $23.78 | | | | |
| 08/23/13 | 1,888 | $23.82 | | | | |